## JONES v. SHEHEE FORD WAGON & HARNESS CO., Inc., et al.*

### No. 4838.

Court of Appeal of Louisiana. Second Circuit.

Nov. 2, 1934.

Irion & Switzer, Henry F. Turner, and Dickson & Denny, all of Shreveport, for appellants.

Kennon & Kitchens, of Minden, for appellee.

*Rehearing granted December 5, 1934.

DREW, Judge.

Plaintiff instituted this suit against the Shehee Ford Wagon & Harness Company, Incorporated, of Shreveport, and its insurer, Continental Casualty Company, seeking judgment against them, in solido, in the sum of $7,500, with interest and costs. Later plaintiff filed a supplemental and amended petition seeking an increase in the amount sued for from $7,500 to $11,500.

The suit is based upon an alleged cause of action wherein plaintiff set forth that on Friday, June 16, 1933, he was riding as a guest in a school truck with one Joe Kight on the White Hall Church road in Claiborne parish, La. He then alleged that as the truck approached the Blackman and Haynesville highway, which crosses the White Hall Church road at right angles, it gradually slowed down and finally came to a stop before entering the intersection, and that a car, driven by one J. M. Tarpley, was approaching on the Blackman-Haynesville highway from the left of the truck and made a sweeping right-hand turn into the White Hall Church road; that the car came over onto the side of the road where the truck was in which plaintiff was sitting, which he alleges was on its right-hand side of the road, and crashed into the truck and injured plaintiff. Plaintiff alleges that J. M. Tarpley, the driver of the car, was an employee of the Shehee Ford Wagon & Harness Company, Incorporated, and that he was at the time on a mission of his master and acting within the scope of his employment. Plaintiff itemized the damages claimed.

The Shehee Ford Wagon & Harness Company, Incorporated, answered the petition of plaintiff denying the material allegations of the petition and alleged, as an affirmative defense, that J. M. Tarpley was not an employee of it, but that he was an independent contractor.

The Continental Casualty Company filed two exceptions, one termed an exception of no cause or right of action, and the other a plea of prematurity, both of which were overruled. It then filed an answer denying the allegations of plaintiff's petition and alleged that J. M. Tarpley was not an employee of the Shehee Ford Wagon & Harness Company, Incorporated, but was an independent contractor.

After trial the lower court rendered judgment in favor of plaintiff and against the defendants, in solido, for $2,212.50, from which judgment both defendants have perfected an appeal.

It is admitted in this court that the accident in which plaintiff alleges he was injured was caused by the gross negligence of J. M. Tarpley, the driver of the car; therefore, the only defense urged in this court by the Shehee Ford Wagon & Harness Company, Incorporated, is that of independent contractor.

The facts of the employment of Tarpley by the said Wagon & Harness Company can best be shown by quoting the testimony of Mr. Shehee, president of said company, which is the only testimony regarding the contract of employment of Mr. Tarpley. It is as follows:

"Q. Mr. Shehee, you are the president of the Shehee Ford Wagon & Harness Company, the defendant in this suit? A. Yes, sir.

"Q. Do you know Mr. Jim Tarpley? A. Yes, sir.

"Q. What is his business? A. Traveling salesman for Shehee Ford & Wagon Company.

"Q. Is that the defendant in this suit? A. Yes, sir, one of them.

"Q. Was he working for you on the afternoon of Friday, June 16, 1933. A. I suppose he was.

"Q. Is that in his regular route—to go from Haynesville to Leton? A. He goes wherever he feels like going.

"Q. You have talked with him about this? A. Yes, sir.

"Q. What was his regular run? A. He has a regular territory that he makes different weeks. He has no regular run, but he goes where he pleases.

"Q. To be at that place, the place of the accident, at that time was in his territory? A. That is all in his territory.

"Q. Mr. Joe Lee at Leton is one of your customers? A. Yes, sir.

"Q. Mr. P. C. Ware at Haynesville is one of your customers? A. Yes, sir.

"Q. What kind of car does he drive? A. Model 'A' Ford.

"Q. Does it belong to you? A. Yes, sir.

"Q. That was your car? A. Yes, sir.

"Q. Do you carry insurance on it? A. Yes, sir.

"Q. Who with? A. Continental Casualty Company, I believe.

"Q. Do you have your policy with you? A. Yes, sir.

"Q. Let me see it. * * *

"Q. Think you have already testified you were the president of the Shehee Ford Wagon & Harness Company, Inc.? A. Yes, sir.

"Q. Explain the arrangement between yourself and Mr. Tarpley with regard to his employment? A. Well, he was employed as a traveling salesman with headquarters in Homer, and of course, he has his regular routes that he is supposed to travel each week.

"Q. Who makes up that route? A. Well, it is an established route by both of us. When he is traveling in his territory, he goes where he wants to. He knows more about that than I do.

"Q. What territory does he have? A. Everything east of Red River in Louisiana. Part of Webster Parish, Bossier Parish, Claiborne, Bienville, etc.

"Q. Does he report to you every morning? A. No, sir.

"Q. Do you have any control over where he is going? A. He goes where he wants to.

"Q. Does he call you up or report and get instructions where to go each day? A. No, sir.

"Q. How often does he report to you? A. Some weeks he is in twice and the next week he may not be in at all.

"Q. Does he report where he has been or where he is going? A. No, sir.

"Q. Is he at any time required to report to you where he is going on a particular day? A. No, sir.

"Q. To whose discretion is that left? A. To his.

"Q. You furnish him a car for that purpose? A. Yes, sir.

"Q. Did you know on June 16, 1933, when this accident occurred, he was going to Leton at the time he went? A. No, sir.

"Q. Did you send him there? A. No, sir.

"Q. Did anyone in the corporation send him? A. No, sir.

"Q. This automobile he uses, is it correct that he buys the gasoline and you pay him for it? A. We furnish him expense money.

"Q. Is that a regular amount? A. No, sir.

"Q. Does the amount he spends vary? A. Yes, sir. When he started to work we furnished him so much money. From that time on he sends his expense book in and we give him cash for it.

"Q. Where is Shehee Ford Wagon & Harness Company? A. 619 Spring Street, Shreveport.

"Q. Does it have a store or anything in Homer? A. No, sir.

"Q. Why is Mr. Tarpley's headquarters in Homer? A. He lives there.

"Q. This accident occurred on June 16th? A. I think so.

"Q. When did you report it to me or to Mr. James Smith, the agent of the insurance company?

"By Mr. Kennon: That is objected to as self-serving, further, for the reason that it is res inter alios acta.

"By the Court: Let the objection be referred to the effect of the evidence and the evidence admitted subject to the objection.

"A. I reported it to Mr. Smith on the day I received the letter from the attorney at Minden. That is the first I knew of it.

"Q. If you saw that letter, would you recognize it? A. Yes, sir, I think so.

"Q. Is that it? A. Yes, sir.

"Q. That letter was dated when? A. July 12th.

"Q. Then you received it on July 12th? A. I think I received it the following day.

"Q. Had you seen Mr. Tarpley between the time of the accident and the day you received this letter? A. Yes, sir.

"Q. And he had not mentioned it? A. Yes, sir, said he had an accident, but nothing about Mr. Jones.

"Q. And you did not know about Mr. Jones? A. No, sir.

"Q. And do you think Mr. Tarpley knew about Mr. Jones? A. I don't know.

"Q. You paid Mr. Tarpley a commission on the stuff he sold? A. No, sir, straight salary.

"Q. Do you have a maximum that if he goes over that he gets a commission? A. No, sir.

"Q. His business is to do what? A. To call on the trade, sell them merchandise.

"Q. If he finds a new man in the territory is he supposed to call on him? A. Yes, sir.

"Q. Believe you say he gets a straight salary? A. Yes, sir.

"Q. He has an established route. In other words, you are his boss and could change his territory over in Caddo Parish? A. Yes, sir.

"Q. In other words, he is just a straight employee of yours by the month? A. He is supposed to be working for me.

"Q. If you decided some particular day you wanted him to call on somebody in Caddo Parish, you could have him do it, and while you don't take the trouble to supervise him

any time of the day, you have that privilege? A. Yes, sir, if he didn't, I could fire him.

"Q. You have the right to tell him to cover any certain territory? A. I think I have, yes.

"Q. He is not an independent contractor, is he?

"By Mr. Switzer: That is objected to as calling for an opinion of the witness—that is something for the court to determine.

"By the Court: The objection is sustained.

"Q. Who does he work for? A. Shehee Ford Wagon & Harness Company.

"Q. Whose business was he on on June 16, 1933, when he went to Leton? A. I presume ours.

"Q. You were paying for his gasoline and oil? A. Yes, sir.

"Q. He was in your car? A. Yes.

"Q. And his going to Leton, that would be within the scope of his employment with you? A. Yes, sir.

"Q. And you don't tell the court that he was not an employee of yours? A. No, sir.

"Q. And he was in your employ with your car burning your gas at that time? A. Yes, sir.

"By Mr. Switzer:

"Q. If Mr. Tarpley did not call on the trade within any one day, would you know of it? A. No, sir, we would not know it.

"Q. Would you fire him when you found it out? A. No, sir.

"Q. What day was it when you first found out about this car having been in a collision—the accident happened on June 16th? A. Now the first I heard about the accident was when Mrs. Tarpley phoned us.

"Q. When was that? A. I think she telephoned Mr. Ford at his home the night of the accident."

The other testimony in the record, as to what Mr. Tarpley was doing on the day of the accident and at the time of the accident, was given by Mr. P. C. Ware, of Haynesville, a merchant, who testified that Tarpley called on him the afternoon of the accident on business of defendant; and Mr. Sasser, of Leton, who was employed by a merchant at that place, testified he expected Mr. Tarpley to call on him the afternoon of the accident to sell him some goods for the defendant company, and that he was informed later by Tarpley that the reason he did not come that afternoon was due to the accident. The accident occurred on the road leading from Haynesville to Leton. Mr. Tarpley did not testify in the case, although he was sworn and took the stand.

The testimony is most convincing that Mr. Tarpley at the time of the accident was engaged in his employer's business and performing the duties he was employed to perform. He was driving his employer's car, with gasoline and oil furnished by his employer. The testimony of Mr. Shehee, president of defendant company, clearly shows that it had the right under the contract of employment to direct the actions of Mr. Tarpley. It further shows that defendant company did not exercise that right to any great extent. However, the test is not that defendant did not exercise the right of control or direction it had over Mr. Tarpley, but is the fact that it had the right under the contract of employment.

In the case of Valley v. Clay, 151 La. 710, 92 So. 308, 309, the court, after citing a number of Louisiana cases, concluded by saying: "The rule, as laid down in all of these cases, is that, for the master to be liable, the injury must have been caused by some act expressly or by reasonable implication within the scope of the agent's employment. If the service be performed in an unlawful, or even a criminal manner, the master is liable, so long as the thing done forms a part of the servant's duties."

In the case of James v. J. S. Williams & Son, 177 La. 1033, 150 So. 9, 11, the Supreme Court said:

"Whether Rhodes took the car to subserve an 'individual purpose' of his own, or whether he took and used it solely to accommodate Jemison, is not material. In either event, he was not using it 'in the exercise of the functions' for which he was employed, and therefore the relationship of master and servant, or employer and employee, was suspended while the car was being so used, and the doctrine of respondeat superior applies 'only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong, at the time and in respect to the very transaction out of which the injury arose.'

"The mere fact that the person to whose negligent and wrongful act the injury and damage is attributable was in the general employment of another person 'does not necessarily make the latter the master, and responsible for his acts. The master is the person in whose business he is engaged at the time and who has the right to control and direct his.

conduct.' Berry on Automobiles (6th Ed.) Vol. 2, § 1315; Atkins v. Points, 148 La. 958, 88 So. 231, 232; Tinker v. Hirst, 162 La. 209, 110 So. 324.

"Liability in cases of this kind depends, not upon the fact of ownership of the car and the general employment of the person who drives it and causes the injury, but upon whether the driver was, at the time of the injury, in the exercise of the functions for which he was employed, for it is only while in the exercise of those functions that the relationship of master and servant or principal and agent exists.

"An employee is the agent or servant of his employer only while engaged in doing for his employer something which he has been directed to do or some act which can be reasonably and fairly said to be a natural incident of the employment, or logically and naturally connected therewith. But when an employee turns entirely and wholly aside from the purposes for which he was employed and engages in some act or enterprise in no way connected with or incidental to his employment, the employer is not responsible for damages caused by the employee while so engaged.

"The rule which prevails here and elsewhere is that 'the owner of an automobile is not liable to one who is injured by the negligence of his chauffeur while operating the machine without his knowledge or permission, and for a purpose other than that for which he was employed, as where the driver is on errand personal to himself.' Tinker v. Hirst, supra; 2 R. C. L. 1198, § 33.

" 'The reason for the rule is that, in order to render the owner liable for the acts of the servant, the relationship of master and servant must exist at the time of such acts, and such acts must be done by the servant within the scope of his employment.' "

The Louisiana case relied upon by defendant to sustain its position that Tarpley was an independent contractor is the case of Marquez v. Le Blanc (La. App.) 143 So. 108, 113. This case is based, to a great extent, upon the case of McCarthy v. Souther, 83 N. H. 29, 137 A. 445, and we quote from that case as follows:

" 'For service not subject to the employer's control and direction in its details, on principle, he is no more to be held for its faulty performance than for the liability of an independent contractor. If the employer may not direct how a thing shall be done, then what the agent or servant does is not the employer's act. That he has the right under

the contract of employment to have the thing done is not enough to impose liability. That right obtains as well in cases of independent contracts. The further right to direct the manner of performance must appear. * * * ' "

And in the case of Pyyny v. Loose-Wiles Biscuit Company, 253 Mass. 574, 149 N. E. 541, from which we quote as follows:

" 'On the above facts it is plain Bancroft was his own master in respect to the time he should devote to the business of the defendant, and to the place within certain designated territory where he should solicit sales. It is also plain that it was his duty and not that of the defendant to register the automobile and obtain a license to operate it. The defendant had no right on the reported facts to direct the manner in which Bancroft should control his car. It assumed no obligation to keep the car in repair other than is involved in its agreement to pay the expense of operating it, or, as 'the plaintiff puts it in his brief, to pay "so much per mile for the number of miles that he (Bancroft) operated said car for them in connection with his employment." * * * ' "

We do not think the courts of this state have ever before subscribed to the doctrine laid down in the quotations from the McCarthy and Pyyny Cases, and that the majority rule in other jurisdictions is that one is not an independent contractor when, under the contract of employment, the employer has the right to direct how a thing shall be done. It is the right under the contract and not the exercise or want of exercise of that right which governs. Abate v. Hirdes, 9 La. App. 688, 121 So. 775; Crawford v. McElhinney, 171 Iowa, 606, 154 N. W. 310, Ann. Cas. 1917E, 221; Borah v. Zoellner Motor Car Co. (Mo. App.) 257 S. W. 145; Burgess v. Garvin, 219 Mo. App. 162, 272 S. W. 108.

In Abate v. Hirdes, 9 La. App. 688, 121 So. 775, 776, decided by the Orleans Court of Appeal in 1928, and in which a writ of review was refused by the Supreme Court on February 13, 1929, the court said:

"Whether he was an independent contractor or an agent depends on whether or not the Item Company had the right of supervision and control. The actual exercise of that right is not essential. The question depends solely upon the existence of the right."

In the case of Shea v. Reems, 36 La. Ann. 966, the Supreme Court of this state said:

"The evidence leaves no doubt that Rickert was employed by defendant, Reems, to peddle

goods for the latter at a fixed wage of six dollars per week, with an additional compensation of two per cent. on the price of all goods sold, and with the privilege of keeping any excess of price for which he sold the goods, over and above the prices limited by Reems.

"Under the textual provisions of the Code this contract established the relation of master and servant. Servants, says the Code, are those—'who let, hire or engage their services to another in this State, to be employed therein at any work, commerce or occupation for the benefit of him who has contracted with them, for a certain price or retribution, or upon certain conditions.' Article 163.

" 'There are three kinds of servants, viz.: 1. Those who hire out their services by the day, week, month or year, in consideration of certain wages; 2. Those who engage to serve for a fixed time, etc.; 3. Apprentice, etc.' Article 163.

"Rickert clearly belonged to the first class of servants, and Reems bore to him the correlative relation of master.

"There seems little need to refer to common law authorities on the subject, but, were we to do so, they would afford defendant no relief. In that system the test of the relation of master and servant is found in the question whether one person has placed himself under the direction and control of another in such manner as to confer upon the latter the power of discharge for disobedience. Cooley on Torts, p. 532; 2 Thompson on Neg. p. 892, and authorities cited.

"Our Code ordinarily infers such power of control and discharge from the payment of wages. We find the same rule to prevail at common law, where, in discussing the distinction between servants and independent contractors, it is thus stated by Mr. Thompson:

" 'Perhaps the most usual test by which to determine whether the person doing the injury was a servant or independent contractor, is to consider whether he was working by the job or at stated wages—so much per day, week or month. A person who works for wages * * * is a servant, and the master must answer for the wrongs done by him in the course of his employment.' Thompson on Neg. p. 912, § 39.

"And, indeed, it would be difficult to imagine one person's binding himself to pay a fixed compensation weekly ·for the service of another, if the latter were to be emancipated from the former's direction and control and left free to perform the service or not at his whim, or to perform it in a manner opposed to the employer's will, and, perhaps, yielding him no benefit. If the term of employment had been for one year and at a fixed annual compensation, the incongruity of such a construction would be more striking; but the principle is identical.

"The attempt to pervert the relation between Reems and Rickert into a mere bailment to sell goods upon commission like the relation between a cotton factor and his shipper, is entirely negatived by the contract for wages, which placed Rickert's time and labor at the exclusive service and control of Reems within the scope of the employment.

"The fact that, under the laws of the United States, Rickert, in order to peddle tobacco for himself or anybody else, was compelled to take out a license in his own name does not affect the case. Suppose the Constitution permitted and the law required clerks in mercantile houses to take out a license on their occupation: would that destroy the relation of master and servant between them and their employers?

"Nor is the case affected by the fact that Rickert was the owner of the horse and wagon which he was driving. It is not denied that the horse and wagon were essential to the service for which he was employed. In fact, at the date of the employment they belonged to Reems, who sold them to Rickert on credit, and who took them back, after the termination of Rickert's employment, on refunding such part of the price as the latter had paid. The service for which Rickert was employed was to peddle goods for Reems with that horse and wagon; in driving the same in that business he was acting as a servant in the course of his employment, and for injury done by him the rule of respondeat superior applies, independent of the ownership of the horse and wagon."

See, also, case of Holmes v. Railroad Company et al., 49 La. Ann. 1070, 22 So. 403.

In Johnson v. Vincennes Bridge Company, 167 La. 107, 118 So. 820, 821, the court said:

"The nature of the contract was established by the terms of the agreement, and neither of the parties could control its legal effect."

■ Under the above decisions and the testimony of Mr. Shehee, we are convinced that Tarpley was the servant of the defendant Shehee Ford Wagon & Harness Company, Incorporated, and was not an independent contractor, and that the defendant Shehee Ford Wagon & Harness Company, Incorporated, is liable in damages to plaintiff for the acts of negligence of its servant, Tarpley.

■ The exception of prematurity filed by the Continental Casualty Company was based upon that provision of the policy to the effect that the injured person should not have a right of action against the company until the amount of loss had been fixed by final judgment against the insured after trial or by agreement between the parties, with the written consent of the insurance company, and that there was no such consent or previous trial had. This exception is not urged here and is not tenable, under decisions by the Court of Appeal for the Orleans Circuit in the case of Bougon v. Volunteers of America, 151 So. 797, and by this court in Rambin v. Southern Sales Co., 145 So. 46.

■ The exception of no cause or right of action filed by defendant Continental Casualty Company is based on the alleged fact that the other defendant Shehee Ford Wagon & Harness Company, Incorporated, the insured, breached the terms and conditions of its contract of insurance with exceptor by failing to report said accident in which plaintiff is alleged to have been hurt until July 12, 1933, although the accident occurred on June 16, 1933. This exception was submitted to the lower court without any evidence having been taken on same and was properly overruled there. While it is true no evidence was allowed under the exception of no cause of action, evidence might have been taken under the exception of no right of action. Since exceptor offered no evidence and submitted the exceptions to the court, and they were passed on in limine, the ruling thereon is correct.

■ The said Continental Casualty Company in its answer did not urge the defense set up in its exception of no cause or right of action, other than to reserve its rights under the exception. The defense is a special one and should have been pleaded in its answer. However, the evidence was admitted on trial of the case, without objection, to show that the accident occurred on June 16, 1933, and the first notice given to defendant Casualty Company was on July 12, 1933, or 26 days after the accident occurred. The pleadings were therefore enlarged.

The defendant Casualty Company in this court seriously urges that the notice given to it was too late and that under the provisions of the policy issued by it to defendant Shehee Ford Wagon & Harness Company, Incorporated, the said insured obligated itself to give immediate notice. The provision of the policy reads as follows:

"Conditions—R. This insurance is subject to the following conditions, and failure on the part of the assured to comply therewith or with the provisions of any endorsement attached to this policy, shall forfeit the right of the assured or of any judgment creditor of said assured to recovery hereunder.

"1. Notice, Claims & Suits. The assured shall give to the company, or its authorized agent, immediate written notice of any accident causing loss covered hereby and shall also give like notice of claims for damages on account of such accidents. Notice given by or on behalf of the assured to any authorized agent of the company with particulars sufficient to identify the assured, shall be deemed to be notice to the company. Failure to give any notice required to be given by this policy within the time specified herein shall not invalidate any claim made by the assured if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible. If any suit is brought against the assured to recover such damages, the assured shall immediately deliver to the Company, or its authorized agent, every summons or other process served upon him. The company shall have the exclusive right to contest or settle any of said suits or claims. The assured shall not interfere in any way respecting any negotiations for the settlement of any claim or suit, nor in the conduct of any legal proceedings, but shall; at all times, at the request of the company, render to it all possible co-operation and assistance. The assured shall not voluntarily assume any liability for an accident."

■ The word "immediate" has been held by the courts to mean within a reasonable time.

■ The president of the insured, in this case, testified that the night of the day of the accident, its employee who was in the accident, or his wife, telephoned him of the accident, but did not tell him plaintiff was hurt; that the next report of the accident came from the attorneys, representing plaintiff, on July 12, 1933; and that he gave notice to the insurer on that date. He does not testify that he was misled or that he made any effort to find out if any one had been hurt in the accident. Furthermore, the negligence of the insured's agent could not relieve it of its duty to report the accident, for the negligence of its agent is imputed to it.

A similar question was before us in the case of Howard v. Rowan, 154 So. 382, 384, in which we held that compliance with the provisions of the contract of insurance, as to no-

tice, is a condition precedent to liability. The courts of this state and nearly every other state in the union have so held:

"In the case of Dennis Sheen Transfer v. Georgia Casualty Company, 163 La. 973, 974, 113 So. 165, 166, the Supreme Court of Louisiana said: 'The giving of immediate notice to the insurer of the accident insured against is a matter of importance to it. Prompt notice places the insurer in a far better position to ascertain the facts relating to the accident, and the names of the witnesses by whom those facts may be established, than a notice long delayed, and frequently enables the insurer to make a more satisfactory adjustment than could be otherwise made. The policy makes the giving of immediate written notice by the assured a condition precedent to liability. Where such is the case, there can be no recovery on the policy by the assured, in the absence of the giving of the required notice, unless the giving of it has been waived. It cannot be said that notice delayed nearly three months is immediate notice. Oakland Motor Co. v. American Fidelity Co., 190 Mich. 74, 155 N. W. 729.' See, also, notes beginning on page 177 of 76 A. L. R., where decisions of nearly every state in the Union are cited, holding to the same view."

It will be noted that the court, in quoting the paragraph above, gave as one reason for the rule that prompt notice frequently enables the insurer to make a more satisfactory adjustment than could be otherwise made. The soundness of that reason is borne out in this case by the testimony of plaintiff, who testified as follows:

"Q. I have a letter dated July 12th—is that the day you first consulted a lawyer about this case? A. Yes, sir.

"Q. Was that something like a month after the wreck? A. It lacked four days being 30 days.

"Q. During this 30 days then, did the Shehee Ford Wagon & Harness Company send anyone to see you? A. No, sir. I just picked up their name by hearsay. If they would have come up to see me in a few days and talked to me about it and consulted me I would have compromised it easy, but nobody never come about that knowed anything about it. They never treated me like I was human. He found out that I got hurt and never let on. If they had come to me and says here Mr. Jones, we will help you about your crop or we will help you along until you get up on your feet and will treat you right, it would have been all right, but they would not do it. I never got one bit of consolation out of them. If I hurt anybody I would go back and see how bad they were hurt and how many days he was sick, if nothing else. I wouldn't treat anybody like a dog."

We therefore conclude that the notice which was delayed for 26 days, under the facts in this case, was not the immediate notice required by the policy, and the insurer, Continental Casualty Company, is not liable to the insured, Shehee Ford Wagon & Harness Company, Incorporated, under the contract of insurance.

It is urged by plaintiff that, regardless of this finding, the insurer is liable to plaintiff. We likewise settled that question in the case of Howard v. Rowan, supra, in which we held for the same reason the insurer was not liable to the insured, it was not liable to plaintiff. Act No. 55 of 1930.

Plaintiff was injured on June 16, 1933, and the case was tried below on December 13, 1933. The injuries received by plaintiff were a cut over the eye, a cut on one hand, body bruises, and a knee injury. All of the injuries healed within a few weeks after the accident, except the injury to the knee, which was still serious enough to disable plaintiff from performing manual labor on the date of the trial below. Plaintiff suffered a great amount of pain, was confined to his bed for a week or two, and, up to the time of trial, was forced, due to the knee injury, to use a crutch.

Plaintiff is a small hill farmer whose average crop of cotton is about four bales a year, three or four wagon loads of corn, peas, peanuts, and other hay in small quantities. His earning power before the accident was small. With the help of his wife, he managed to eke out a living for them on his 60-acre hill farm.

Immediately after the accident plaintiff was treated by his family physician, who treated him three or four times. He bandaged his wounds and instructed him to keep off his feet. Plaintiff was given no actual treatment for the knee injury, and the record discloses that if he had had proper treatment of the knee, it probably would have been well by the time of trial below. All the doctors who testified in the case agree that the injured knee is one-fourth of an inch larger than the other, and that there is excess fluid in the knee joint. The injury was diagnosed as traumatic arthritis, or synovitis of the left knee joint. It is generally agreed by the doctors that the necessary treatment to relieve plaintiff's condition will cost from $200 to $250, and, with treatment, he may get well in six months and maybe not for two years,

None of the doctors, however, consider the injury to his knee permanent.

██ The lower court allowed $2,000 for loss of time, pain, suffering, and damage to the knee, and $212.50 for medical treatment. Defendant complains here that the judgment is excessive and plaintiff has answered the appeal praying that it be increased to the amount sued for. We are of the opinion that the judgment is in line with the jurisprudence of this state and find no good reason for disturbing the amount of the award.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be amended by rejecting the demands of plaintiff as to the Continental Casualty Company, at plaintiff's costs; and in all other respects the judgment of the lower court is affirmed.