### JONES v. AMERICAN MUT. LIABILITY INS. CO. et al.*
### No. 16868.

Court of Appeal of Louisiana. Orleans.

Jan. 10, 1939.

*Rehearing granted March 13, 1939.

510

O'Keefe & Davison, and Alex. C. Granzin, all of New Orleans, for appellant Jones.

Cyril Dumaine, of New Orleans, for appellant Charity Hospital.

Rosen, Kammer, Wolff & Farrar, of New Orleans, for appellant American Mut. Liability Ins. Co.

Holmes & Ferguson, of New Orleans, for appellees Wm. S. Ferguson.

WESTERFIELD, Judge.

Richard Jones was run into and fatally injured by an automobile driven by William S. Ferguson on January 17, 1937, at about 5 a. m., at the intersection of St. Charles Avenue and Felicity Street. He died twenty-three days later on February 8, 1937. His mother, Ibbie Jones, brought this suit for damages under Revised Civil Code, Article 2315, against William S. Ferguson and his insurance carrier, the American Mutual Liability Insurance Company, in solido, claiming $29,880. She alleges that the accident which resulted in her son's death was due solely to the negligence of Ferguson. Each defendant filed separate answers. Ferguson denied all charges of negligence imputed to him and, in the alternative, pleaded contributory negligence. The American Mutual Liability Insurance Company admitted that it had issued a policy covering a certain Ford Sedan, but averred that the policy was issued to Mrs. Jos. J. Ferguson and not to William S. Ferguson. It also averred that its policy contained a "condition" with respect to notice of an accident which had not been complied with and that, therefore, under the terms of the policy no action could lie against it. In the alternative, it pleaded the contributory negligence of Richard Jones as the proximate cause of the accident.

The Charity Hospital of the State of Louisiana intervened and claimed $353 as the cost of hospitalization given Richard Jones and prayed that it have judgment for that amount in the event of plaintiff's recovery.

There was judgment below dismissing plaintiff's demand and both plaintiff and intervenor have appealed.

The first question to be determined involves the responsibility of the defendant William S. Ferguson. St. Charles Avenue is one of the principal thoroughfares in the City of New Orleans. It is divided by a neutral ground on which there are two car tracks with a paved roadway on each side devoted to one way traffic. Ferguson, accompanied by two of his friends, Beale Chambers and Emile Hymel, was on his way home from a Carnival Ball and was driving his Ford Sedan up St. Charles Avenue in the direction of Carrollton Avenue. At the intersection of St. Charles Avenue with Felicity Street, there is a traffic light or semaphore signal on the far side of the intersection from the direction from which Ferguson approached it. Jones apparently entered St. Charles Avenue in Felicity Street and crossed the roadway devoted to traffic moving in the direction of Canal Street and the neutral ground, and had entered the roadway on which Ferguson was traveling, which is devoted to traffic moving in the opposite direction, to the extent of six or seven feet when he was struck by the Ferguson automobile. Ferguson is charged with excessive speed and the failure to keep a proper lookout. The traffic ordinance of the City of New Orleans, No. 13,702. C.C.S., when offered in evidence, was excluded by the trial judge upon the ground that it had not been properly pleaded. The plaintiff's petition contains the following allegation:—

"Petitioner avers that said defendant, William S. Ferguson failed to give a warning of his approach, and that he was operating his automobile at an excessive rate of speed, all in violation of the traffic laws of the City of New Orleans."

The trial judge was of the opinion that plaintiff was under the necessity of giving the number of the ordinance, but in our opinion this ruling was erroneous. There is but one traffic ordinance in the City of New Orleans and we believe the reference to it in plaintiff's petition to be sufficient to comply with the rules of pleading.

Under Article V, Section 3 (b) of that ordinance the speed limit on St. Charles Avenue is thirty miles per hour, therefore, Ferguson was driving somewhat beyond the legal limit when he struck Jones, as it is conceded that his speed was thirty-five miles per hour. He testified that he did not see Jones until he struck him and endeavors to explain his failure to see him by . stating that he was behind the post supporting the traffic light, which is on the far side of the intersection as Ferguson approached it and just beyond a paved walk used by pedestrians. This post, which is spherical in shape, is much too small to obscure the body of a man. Moreover, we are convinced that Jones was not behind it at any time before the accident.

Ferguson and his companion, Chambers, were the only two witnesses who testified for defendant that were present at the scene of the accident. According to the testimony of Ferguson, he was driving near the neutral ground, about three feet distant; that the intersection was brightly illuminated and that there was no impediment to his vision unless we consider the traffic light which, as we have said could not have interfered. He did not see Jones at all and only knew that he had hit him by the strain on the steering wheel caused by the impact with Jones' body and his right front fender which was damaged, as was the right front headlight. He also testified that it was the left front portion of his car that came into contact with Jones. As a matter of fact, he is most uncertain on this point and seems to quibble on the question of whether he struck Jones or Jones struck his automobile. He stated that there were no vehicles on the roadway or the Felicity Street intersection and that the road was clear. To the same effect is the testimony of his companion, Beale

Chambers. The third occupant of the car, Emile Hymel, did not testify.

Plaintiff produced two witnesses, Nicholas Aranda, the driver of a Yellow taxicab, and Joseph Paternostro, his passenger. According to these witnesses the Yellow Cab was waiting in the Felicity Street intersection for traffic to clear. Paternostro, the passenger, said that he saw Jones standing on the pedestrian walk waiting for an opportunity to cross the street; that two vehicles passed by and the third one struck Jones. Neither saw the Ferguson car before the accident. Ferguson and Chambers deny that there was any taxicab near the scene of the accident before or afterwards and also deny that there were any cars in front of the car in which they were traveling.

 It is apparent that plaintiff's witnesses are in irreconcilable conflict with defendants and that their evidence, if accredited, makes out a different factual and legal situation. It is one thing to say that the Ferguson car approached the intersection behind two automobiles, and that Jones permitted the first two cars to pass him before entering the intersection and then stepped out in front of the Ferguson car, and quite another to declare that there were no vehicles ahead of the Ferguson car and none on the intersection as the Ferguson car approached. In the first case however negligent Ferguson may have been, the contributory negligence of Jones in walking into the street behind two vehicles would preclude his recovery, there being no room for the application of the doctrine of last clear chance upon which plaintiff confidently relies, whereas in the version of the accident as given by Ferguson and Chambers, Ferguson's responsibility is, at least, debatable. If we felt that we could accept the plaintiff's version, though favorable to Ferguson and contradictory to his own statement of the accident, we conceive it to be our duty to do so, since we must find the facts from the record as made up by credible witnesses, regardless of whether they testify for plaintiff or defendant. It is obvious that neither Aranda, the taxicab driver, nor Paternostro, the passenger, have any interest in the outcome of this litigation, consequently, their evidence cannot be said to be biased from the standpoint of interest, but they were testifying to facts which happened nearly a year before their

evidence was given and they might easily have been mistaken. For example, it seems most unreasonable that Jones should have waited for two cars to pass and stepped out in front of a third car and much more likely that if Jones was guilty of the imprudence of stepping into the roadway in the face of oncoming traffic, he would not have waited for two automobiles to pass before doing so. We cannot, however, accept the testimony of Ferguson and Chambers to the effect that no Yellow Cab was present at the scene of the accident, as we do not believe that the driver and passenger would have deliberately testified to a circumstantial account of the occurrence without being present at all and thus commit flagrant and apparently useless perjury. In this dilemma, if we analyze the conduct of Ferguson from the standpoint of his own testimony in an effort to determine his culpability he, at least, should not complain. He says that the roadway and intersection were clear and well lighted and that there was no obstruction to his view; that he approached the intersection at about thirty-five miles per hour, traveling three feet from the neutral ground or left-hand side of the street; that he did not see Jones before he struck him and that when he struck him he was about six or seven feet from the neutral ground in the roadway. His negligence is apparent on both grounds charged by plaintiff, though the question of speed is not nearly so important as that involving his failure to keep a proper lookout. He was traveling only five miles per hour in excess of that permitted by the traffic ordinance, but even though he had been within the legal limit or less, the situation would not have been different, for if he had been looking ahead he must have seen Jones on the neutral ground and it is the duty of a motorist in approaching an intersection to look for pedestrians who might be or become imperiled and negligently or otherwise step out in the path of their automobile.

 Jones was also negligent. It is the duty of a pedestrian before entering a roadway to look in the direction of traffic in order to determine whether a crossing can be safely made and the proximity of Jones to the neutral ground when he was struck, would indicate that he had not taken that precaution, but the negligence of Jones will not preclude his recovery unless we conclude that it was concurrent and the proximate cause of the accident and find that there was no opportunity on Ferguson's part, at a time when, by the exercise of proper care, he might have avoided the accident. In other words, whether the doctrine of the last clear chance is applicable here. The fact that Ferguson did not see Jones before he struck him is immaterial, if he could and should have seen him had he been looking in front of him and, on this point, there can be no question that Jones was in plain view as Ferguson approached the intersection. Ferguson was running at the rate of thirty-five miles per hour, which is approximately fifty feet per second. If Jones was seven feet in the roadway at the time the Ferguson automobile struck him and if he walked from the neutral ground, and there is no suggestion that he ran, he must have required at least two seconds to get to the point of the accident, consequently, at the time that Jones first stepped in the roadway, the Ferguson car was at least one hundred feet away from him, so that if Ferguson had been looking, he would have discovered that Jones intended to cross the street at a time when, by the exercise of ordinary care and prudence, he might have maneuvered his car so as to avoid striking him. For example, he could have turned to the right or he might even have stopped his car within one hundred feet. We realize that the application of mathematics to crossing accidents is not an ideal method of solving the problem of responsibility, since there is to be taken into account the human equation and the interval which must elapse between the sensory impression and its communication to the brain and the reaction of the physical forces of the body by the application of the brakes and the maneuvering of the steering wheel of the automobile. Be that as it may, however, in the instant case, we believe that giving this objection full weight and making all proper allowance for inaccuracies, that the result of the mathematical test shows that the defendant could have avoided the accident if he had been looking where he was going. Moreover, Jones was drunk as defendants' counsel insist. A statement to which Jones affixed his mark, Jones being an illiterate negro, which was obtained by Officer Clark in the presence of Desk Sergeant Ottnot, shows that Jones admitted that he had been drinking all night and was drunk at the time of the accident. The hospital record, introduced in evidence, contains the

words "apparently has been drinking alcoholics" and "alcoholism". The learned trial judge found that Jones was "overwhelmingly drunk", so that the situation which confronted Ferguson as he approached the intersection was one of perfect visibility. There was a traffic light on the far side of the intersection, which was twenty-five feet wide. The light was either green and favorable to Ferguson or it was amber which, under the system of signals obtaining, is intended as a caution signal. Let us say that it was green and that, consequently, Ferguson was guilty of no indiscretion on that account, but Jones, a drunken negro, who had been drinking all night was walking or standing on the pedestrian walk just in front of the traffic light. If he was as drunk as the district judge found him to be there must have been something about his movements to indicate it. He must have walked with slow, uncertain and wavering steps across the intersection and into the path of the rapidly moving Ferguson car. Ferguson should have seen this drunken negro and he should have taken extraordinary precaution because, as has been often observed the presence of children and intoxicated persons in the roadway or nearby, imposes upon the drivers of automobiles the necessity for extraordinary care to prevent injuring them. Jacoby v. Gallaher, 10 La. App. 42, 43, 120 So. 888.

In Jackson v. Cook, 189 La. 860, 181 So. 195, where a drunken pedestrian was injured by an automobile under somewhat similar circumstances, the trial court found that the plaintiff was guilty of the "grossest kind of contributory negligence", but permitted recovery under the doctrine of last clear chance, though the driver of the automobile did not see the plaintiff until the car was about five feet distant from him when it was too late to avert the accident which occurred at night, holding that the defendant should have seen him and should have noticed the dangerous and perilous position in which the plaintiff had placed himself. The Court of Appeal for the First Circuit overruled the judgment of the District Court, basing its opinion upon its understanding of Rottman v. Beverly, 183 La. 947, 165 So. 153. The Supreme Court reversed the Court of Appeal and reinstated the judgment of the district court, stating that the Court of Appeal for the First Circuit had misinterpreted its opinion in the Rottman Case, saying [page 197]:—

"The only difference between the Rottman Case and the case presently before us is this: In the Rottman case Mrs. Rottman was guilty of gross negligence which continued up to the moment of the accident. Beverly, the driver of the automobile, actually saw her in her perilous position in time to avert the accident had he used proper precautions. In the present case the plaintiff was guilty of gross negligence which continued up to the moment of the accident. The driver of the car did not see, but could have seen, plaintiff in his peril if he had been looking ahead. The mere fact that the driver of the car in this case did not see plaintiff does not absolve the defendant from liability, because it was the duty of the driver to look, and, according to the findings of both courts, he was not looking. The Rottman Case is not authority for holding that, merely because the driver of the car in this case did not actually see the plaintiff, the defendant is not liable."

Our conclusion is that the defendant Ferguson is liable.

█ We next consider the responsibility of the co-defendant, the American Mutual Liability Insurance Company. The defenses, other than contributory negligence which we have already discussed, urged on behalf of this defendant, is first that there is nothing to indicate that the Ford Sedan was covered by the policy in the name of Mrs. Joseph J. Ferguson, the mother of defendant William S. Ferguson. This defense is but feebly urged and merits but little consideration. The policy, which is in evidence, contains a clause that coverage shall extend to "not only the named insured but also any person while using the automobile * * * with the permission of the named insured". Aside from the formal denial in the answer the matter was not again referred to during the trial of the case, which was conducted by counsel for the insurer as though there was coverage. It is true that the plaintiff alleges the policy to have been issued in the name of Joseph J. Ferguson, the father, instead of Mrs. Joseph J. Ferguson, the mother, but evidence concerning the liability under the policy was not objected to on that ground and whether the policy was written in the name of the father or mother, there would be coverage under the clause in the policy referred to, if the automobile had been used with the permission of the insured and there has been

no allegation and no proof to the contrary.

The second point raised by the defendant insurance company concerns the sufficiency of notice under the following provision in the policy:—

"Notice of Accident—Claim or Suit—

"Upon the occurrence of an accident, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonable obtainable information respecting the time, place and circumstances of the accident, the name and address of the injured and of any available witness."
and, also:—

"No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the conditions hereof * * *".

The accident happened on the 17th day of January. Plaintiff's son, Richard Jones, died from the effect of his injuries on February 8, 1937. Notice was given the insurance company, according to its statement, on February 11, 1937. It is contended that the notice was not given "as soon as practicable". It is conceded by counsel for the insurance company that in Edwards v. Fidelity & Casualty Company, 1929, 11 La.App. 176, 123 So. 162, this Court held that the provisions of the policy contract with respect to notice do not apply to third persons bringing suit directly against the insurance company. Counsel, however, call our attention to the fact that Act No. 253 of 1918, construed by us in the Edwards Case, was subsequently amended by Act No. 55 of 1930, and points to the following phraseology in the later act as changing the situation:—

"Provided that nothing contained in this act shall be construed to affect the provisions of the policy contract if the same are not in violation of the laws of this State.

"It being the intent of this act that any action brought hereunder shall be subject to all of the lawful conditions of the policy contract and the defenses which could be urged by the insurer to a direct action brought by the insured; provided the term and conditions of such policy contract are not in violation of the laws of this State." Section 2, amending section 1.

In the case of Bougon v. Volunteers of America, La.App.1934, 151 So. 797, we discussed the effect of Act No. 55 of 1930 upon Act No. 253 of 1918, with particular reference to the two sections relied upon by counsel in this case. It is true that in that case the question of notice was not directly involved, but the principle concerned was identical. In the Bougon Case the clause of the policy relied on as defeating the right of the plaintiff to a direct action against the insurance company was one forbidding any action against the insurer until "the amount of loss shall have been fixed either by a final judgment against the assured by the court of last resort, after trial of the issue, or by agreement between the parties with the written consent of the company". [Page 800.] In maintaining an action against the insurance company notwithstanding this clause, this Court, in speaking of the Act of 1930, and the clause relied on there and here, said:—

"These words, it is argued, constitute a qualification of the right of action given to a third person under the act so as to limit to cases in which the policy does not forbid such actions. The Act No. 55 of 1930, the provisions of which we have been discussing, was, it is claimed, enacted by the Legislature in the interest of insurance companies, who are said to have been aggrieved by the ruling of this court in Edwards v. Fidelity & Casualty Company of New York, 11 La.App. 176, 123 So. 162, interpreting Act No. 253 of 1918, wherein we held that, under a provision of that act which required the insurance company to insert in all policies issued in this state a clause permitting the maintenance of an action against it by the injured person 'within the terms and limits of the policy,' a direct action could be maintained against an insurance company notwithstanding a provision in the policy to the effect that the assured was bound to give immediate notice of any accident covered by the policy and the failure of the company to receive any notice until eleven months after the accident occurred, on the ground that those provisions in the policy were not applicable to third persons.

"Whatever reason there was for the amendment of Act No. 253 of 1918 by Act No. 55 of 1930, we are very loath to believe that it was accomplished, as counsel suggested, by insurance companies doing busi-

ness in this state, because our knowledge of the capacity and professional skill of counsel representing these corporations is such as to preclude the thought that so inartistic a statute could have originated in such capable source. In so far as the language of the statute purports to limit an action by a third person to such as might have been brought by the insured against the insurer, it is a manifest absurdity. The foundation of the action of the insured is in contract, to which the injured party is a stranger, except in so far as the statutory provisions may be incorporated in the policy. The basis of the action by the injured party is negligence, or tort; that of the insured a contract of indemnity.

"The insurer in its contract of insurance undertakes to indemnify the insured against 'loss from the liability imposed by law upon the assured for damages on account of bodily injuries including death resulting therefrom accidentally suffered or alleged to have been suffered within the policy period by any person or persons by reason of the ownership, maintenance or use (including loading or unloading) of any automobiles described in the schedule.' It contains a number of other clauses qualifying the obligations of the insurer, as, for example, the provision with respect to immediate notice which we considered in Edwards v. Fidelity & Casualty Co. of New York, supra, and the provision requiring that the assured shall render all possible cooperation and assistance to the insurer in the conduct of legal proceedings growing out of an accident. Referring to this latter provision with respect to co-operation, it would be ridiculous to say that an injured person could only maintain an action against an insurer by co-operating with the insurer to defeat his own action, so that it is obvious that the statute does not mean to limit the action of the injured party to situations where the insured would have a right of action against the insurer. In our opinion, this particular section of the act intends to limit the action of the third person against the insurer to such cases as would involve a liability of the insured and within the coverage of the policy. This was the view we entertained with respect to the former act, No. 253 of 1918, considered in the Edwards Case, and we do not believe that Act No. 55 of 1930, amending the act of 1918, has made any change in this respect.

\* \* \* \* \* \*

"It will thus be seen that, whether intentional or otherwise, the act of 1930, far from destroying or qualifying the effect of the decision in the Edwards Case, enlarged upon it by making certain of the conclusion we had reached upon the subject of insolvency in giving it the status of a legislative enactment. Furthermore, the amending statute greatly increased the privilege of the injured person by conferring a right of direct action against the insurer without the necessity of establishing the bankruptcy of the insured and in advance of the securing of a judgment against it by joining the assured and the insurance company in the original action, or by suing the insured alone, or the insurer alone, and this the act declares may be done in the parish where the accident or injury occurred, or in the parish where the assured has his domicile.

"Considering both acts together, the act of 1918 and the act of 1930, it seems to us too plain for argument that it represents a determination upon the part of the Legislature to extend the rights of an injured party as against the insurer. In the beginning, an action could only be maintained in the event of the insolvency of the insured. Later this right of action was facilitated by a definition of insolvency and a conditional right of action conferred unrelated to the insolvency of the insured and capable of being exercised initially as against the insurer alone, or in conjunction with the insured as a solidary obligation.

"Just a word about the Edwards Case, which, we are informed, has met with considerable criticism, as distinguished an authority as the Supreme Court of California having declared that it is clearly against the great weight of authority. Hynding v. Home Acc. Ins. Co., 214 Cal. 743, 7 P.(2d) 999, 85 A.L.R. 13. We realize that the current of judicial authority is usually right, and therefore that we are probably wrong, but, if so, the mists of misunderstanding have not cleared, and we are still enveloped in the Plutonian darkness of error, for we arise from a reconsideration of that case with a new and more aviding faith in its correctness."

A writ of review was applied for and refused by the Supreme Court.

It is only fair to say that in the case of Howard v. Rowan, 1934, 154 So. 383, in which a writ of review was also refused by the Supreme Court, the Court of Appeal for the Second Circuit held that a delay of

forty-four days "was not immediate notice required by the policy, which was a condition precedent to liability on the part of the insurance company. It therefore follows that the insurer is not liable to the insured, Rowan, under the contract of insurance, and for the same reason the insurer of Rowan is not liable to plaintiff, a stranger to the contract." [page 384.] But in Jones v. Shehee-Ford Wagon & Harness Company, 1935, 183 La. 293, 163 So. 129, the Supreme Court in reversing a decision of the Court of Appeal for the Second Circuit, relied upon by counsel, declined to consider the question, holding that under the circumstances of that particular case, a delay of twenty-six days in the giving of the notice of an accident was a substantial compliance with. the policy provision requiring immediate notice.

█ It thus appears that the situation with respect to the effect of provisions in insurance policies concerning notice as affecting third persons is in doubt, but this Court in, at least, two cases has held that such provision is not binding upon a third party and in the last of these cases, the Supreme Court has declined to issue a writ of review. We are, therefore, of the same opinion originally expressed by us in the Edwards Case, but in any event if a delay of twenty-six days in the giving of notice is in substantial compliance with a policy provision requiring immediate notice, as was held in the Jones Case, supra, a delay of twenty-five days in this case under a policy provision stipulating for notice "as soon as practicable" is, for a greater reason, a substantial compliance with the policy contract so that if we are wrong in the view we entertained at the time the Edwards Case was decided and at the time of the Bougon Case reaffirming that view, and at the present time when we reiterate our opinion, we are confident that we are right in holding that twenty-five days in this case is not too long.

█ We next have to consider the question of quantum. The deceased was a young negro thirty years of age. At the time of his death he was earning $16 per week. He had a life expectancy of 38 years. According to the uncontradicted testimony he contributed $5 per week to the support of his mother, the plaintiff. He remained in the hospital for twenty-three days after the accident, during which time his right leg was amputated just below the knee. He undoubtedly suffered severe pain. We believe an award of $4,000 would be proper.

█ The Charity Hospital for the State of Louisiana intervened claiming $353 under the provisions of Act No. 230 of 1932, and is entitled to this amount.

For the reasons assigned, the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of Mrs. Ibbie Jones, the plaintiff, and against the defendants, William S. Ferguson and the American Mutual Liability Insurance Company of Boston, in solido, in the sum of $4,000 together with legal interest from judicial demand until paid.

It is further ordered that there be judgment in favor of the Board of Administrators of the Charity Hospital of the State of Louisiana, Intervenor, subrogating it to the rights of plaintiff in this judgment to the extent of $353 with legal interest from judicial demand.

Reversed.

JANVIER, Judge (concurring).

Because of the decision of our Supreme Court in Jackson v. Cook, 189 La. 860, 181 So. 195, in which that court placed Louisiana among those jurisdictions in which the doctrine of "discovered peril" renders a negligent automobile driver liable for injuries caused to a negligent, inattentive pedestrian, even though, because of the negligence of both, neither actually discovered the peril of the pedestrian, I concur in the decree against Ferguson, the principal defendant.

I also concur in the decree against the insurer because I feel that reasonable notice was given to the insurer. See Jones v. Shehee Ford Wagon & Harness Co., La.App., 157 So. 309, affirmed by Supreme Court on writs in 183 La. 293, 163 So. 129.

█ I cannot agree, however, that because of what we said in Edwards v. Fidelity & Casualty Co., 11 La.App. 176, 123 So. 162, no notice of the accident need be given an insurer. Act No. 55 of 1930 contains phraseology obviously designed to meet the situation which was presented in the Edwards Case and which, in that case, arose because of the wording of the earlier Act (Act No. 253 of 1918).

Because of the change brought about by the Act of 1930, so far as the necessity for notice is concerned, a different question may be presented. For a discussion of the difference between the two statutes, see Tulane Law Review, Vol. X, page 69, and Tulane Law Review, Volume XI, page 443. In the latter article appears the following:

"The 1930 Act, which contains an express clause designed to overrule the Edwards decision, requires compliance with policy terms that do not deprive the third party of his right of direct action against the insurer."

I am authorized to state that Judge McCALEB concurs in these expressions.