## DUNCAN v. PEDARE et al. *
### No. 1462.

Court of Appeal of Louisiana. First Circuit.
May 14, 1935.

Spearing & McClendon, of New Orleans, and Laycock & Moyse, of Baton Rouge, for appellants.

Fred G. Benton, D. J. Sanchez, and D. L. Weber, all of Baton Rouge, for appellee.

ELLIOTT, Judge.

Thomas M. Duncan alleges that while riding in an automobile as the guest of Roch H. Pedare, being driven by J. P. Roumain in the service of said Pedare, he was badly and permanently injured as the result of the negligent driving of said Roumain. That United States Fidelity & Guaranty Company of Baltimore, Md., insurer of said Pedare against damages arising from the negligent operation of his said automobile, was directly liable to him with said Pedare on said account. He brought suit against Pedare and United

*Rehearing granted June 29, 1935.

States Fidelity & Guaranty Company, claiming of them $9,118.28 in solido as damages because of injuries received as stated.

Roch H. Pedare and United States Fidelity & Guaranty Company, each answering his petition, denied any liability to him, and urged numerous defenses against his demand.

The trial took place before Judge George K. Favrot, and resulted in a judgment in favor of the plaintiff for $4,000. The defendants petitioned for a rehearing, and while it was pending Judge Favrot died. Judge J. D. Womack, his successor in office, acting on the petition, confirmed the judgment that had been rendered by Judge Favrot. The defendants, Pedare and United States Fidelity & Guaranty Company, have appealed.

The evidence shows that the plaintiff Duncan, in the company of said Pedare and J. P. Roumain and Anthony F. Maggio, the latter sometimes called Tony, left Baton Rouge about 3 o'clock p. m. on August 6, 1931, in an automobile belonging to Pedare, and which was being driven at the time of the alleged injury by J. P. Roumain. The parties mentioned were all members of the Baton Rouge aerie of the Order of Eagles, and were on their way to attend a convention of the Eagles at Toledo Ohio; Pedare was a delegate to the convention from the Baton Rouge aerie. The answer of the defendants denies that the plaintiff was the guest of Pedare. The note of testimony shows that Pedare, who, of course, knew the facts as to this matter, as well as the plaintiff, was not examined. He was called for cross-examination by the plaintiff, but the defense, taking the position that he was a nominal defendant, friendly to the plaintiff, he retired without being sworn. We therefore have only plaintiff's version as to his relations with Pedare in making this trip. Duncan testifies that Pedare invited him to go, offering to pay his expenses on the trip, and that he accepted and went along. There is no evidence to the contrary. We therefore conclude that Duncan was riding in the automobile as the guest of Pedare.

Defendants contend that Roumain was not the agent nor hired employee of Pedare, and that, therefore, even if his negligence while driving resulted in injury to the plaintiff, they are not liable for his acts.

■ The evidence shows that the Baton Rouge Lodge furnished Pedare with money to pay his expenses on the trip; that Pedare invited Roumain and Maggio to go with him, promising that the money which the lodge had furnished him would be used as far as it would go to pay the expenses of the party on the trip, after which, we infer from what Roumain and Maggio say on the subject, they paid their own expenses. But it was part of the agreement under which they were making the trip, that they were to do the driving. Roumain and Maggio were therefore riding, with Roumain driving pursuant to an agreement with Pedare under which Roumain was giving service to Pedare for the privilege of riding in his automobile. Roumain was not getting any other pay and did not expect any. We conclude under this showing that Roumain was driving under the authority of Pedare and that the doctrine of respondeat superior applies, rendering Pedare and United States Fidelity & Guaranty Company liable in damages for any injury which the plaintiff may have suffered as a result of his negligent driving.

■ Defendants contend that the parties going on the trip were engaged in a joint adventure, and that plaintiff cannot recover on that account.

The evidence shows that plaintiff had no authority nor control over the driving nor in making the trip. He did not know how to drive an automobile. He was in the automobile because Pedare had invited him to go and was paying his expenses. The defense of joint adventure is not supported by the evidence.

There is serious controversy concerning the place where the accident happened, which the plaintiff alleges resulted in his injury. When the parties reached the parish of Tangipahoa they took the highway which leads north through that parish parallel to the Illinois Central Railroad, on the west side. This highway at the time in question was under construction from the town of Tangipahoa southward toward Amite. The construction work had commenced at the main street of Tangipahoa, leading east and west through the town, but had not proceeded southward at that time very far.

The petition alleges that, "when nearing Kentwood—he came to a detour sign and it was necessary to cross the railroad track and continue the journey on a dirt road on the other side of the track"; that the accident in which plaintiff was injured happened while traversing this detour on the east side of the railroad.

Defendants contend that as there was no dirt detour road at the time near Kentwood which the automobile could have taken, his claim to injury is therefore not to be believed. The highway on which the parties were driving was not under construction between the

towns of Tangipahoa and Kentwood. Roumain and Maggio are therefore mistaken in saying that the accident occurred near the town of Kentwood. In going from the town of Tangipahoa to the town of Kentwood at that time, as well as at the present, the old highway on the western side of the railroad was and is still used, and there was no occasion for making a detour. There was then and is now a railroad crossing which crosses to the east side of the railroad about a half mile south of Tangipahoa, opposite the place which witnesses speak of as the Bowden place. After crossing to the east side, the crossroad intersects a dirt road which parallels the railroad along the eastern side of the railroad, and, upon entering the intersection, you could at that time, and can now, turn north on this dirt road to Tangipahoa. This main stret in the town of Tangipahoa leads east and west through the town. This dirt road intersects this main street just east of the railroad. This main street or road, about a quarter of a mile from the railroad going west, continues, one branch going west, while another turns out sharply from the other, leading north to Kentwood five miles distant. The evidence satisfies us that the parties, after crossing to the east side of the railroad, opposite the Bowden place, took the dirt road north to Tangipahoa. Upon reaching the street mentioned they turned west, recrossed to the western side of the railroad, and followed the highway to Kentwood. This dirt road could have served as a convenient detour while the highway was under construction, just south of Tangipahoa, and was undoubtedly the road on which the parties were driving at the time the alleged injury was sustained. There is an old road starting at the main street in the town of Tangipahoa leads of the railroad, which leads north along the eastern side of the railroad, but just how far it was open to use at that time is uncertain, because there was no occasion for using it as a detour. We are satisfied from the evidence that an accident occurred in the detour, which resulted in injury to the plaintiff, consequently it makes no difference, in acting on the case, whether it was just south of the town of Tangipahoa or just south of Kentwood. The negligent act may be determined from the evidence on that subject, even though the exact location of the detour may be a matter of some doubt.

 The defendants contend that plaintiff did not receive any traumatic injury to his back on the trip to Toledo; that his condition is due to disease existing in his system previous to the trip; that his suffering, etc., is not due to injury but is the result of disease. A large amount of testimony was taken on that subject.

The parties after taking the detour dirt road, and while going at a rate of speed estimated by Roumain and Maggio at from 20 to 25 miles an hour, ran into a rut or ditch which crossed the road.

The rut or ditch was said to be about 12 or 15 inches wide and about 6 inches deep. Roumain says it was nearly filled with dust.

The evidence is to the effect that when the hind wheels of the automobile struck down into this ditch or rut, the automobile rebounded on its springs so that Duncan, seated in the back seat, was pitched against the top of the car and in dropping back on his seat the alleged injury to his first lumbar vertebra is claimed to have been sustained.

The plaintiff at that time was about 58 years of age. He was a tailor and had worked at his trade since early life. For a couple of years or more previous to the time in question his back had troubled him at times. His work as a tailor required him to sit in a bending position. Plaintiff's version of the matter is as follows: "Coming parallel with the railroad on the highway we came to a detour sign which caused us to cross the railroad track and run parallel with the railroad on the other side of the track. We were travelling along at a rate of speed, I could not state; it was too fast. Not being much of a judge of speed. The first thing I knew Pedare and I both hit the roof. I did not feel it so much going up, but when I came down it liked to have split my spine in two, and I hollered 'You have broken my back.' I never was unconscious but I suffered very much."

Roumain and Maggio, speaking of the accident, say that when the automobile struck down in the rut and rebounded the plaintiff exclaimed, "My back is broken." That the automobile was immediately stopped; plaintiff taken out and laid on the grass by the side of the road. That plaintiff complained of pain. One of them says that he was pale; that his face turned white. Plaintiff was placed back in the automobile and the parties proceeded to Kentwood where they stopped at a drug store. Plaintiff went into the store and inquired for a physician. The druggist informed him that none were there at the time, upon which plaintiff bought a plaster and the druggist applied it to his back. This druggist appeared at the trial and identified plaintiff as the party who had called at his store in Kentwood and bought a plaster which he applied to his back. He says he placed it

224

on the lower part of his back toward the sacroiliac bone. That plaintiff was leaning over at the time as if something was wrong with him.

The parties left Kentwood that night and drove on to Jackson, Miss. They continued the trip day after day until they reached Toledo; they remained there several days and then returned in the automobile to Baton Rouge. Plaintiff received no medical attention on the trip, but claims he was in pain all the time. When he got back to Baton Rouge he consulted Dr. Lorio and received in his office what plaintiff described as a hot treatment. After some time, not definitely stated, he consulted Dr. Moore and was treated by him for several months. He then called on Dr. Sitman, and was treated by him for a time not definitely stated. Dr. Sitman advised him to go to the Charity Hospital in New Orleans and have an X-ray made of his lumbar region. He did so, and the X-ray disclosed a fracture of the lower vertebra of his back. He then returned to Baton Rouge, and Dr. Williams made an X-ray which disclosed the same thing. Dr. Lorio, the first physician who treated plaintiff before and after his return, did not have an X-ray made; consequently, he could not see the fracture of his vertebra.

We copy part of the testimony of Dr. Lorio, but are not sure whether he is referring to plaintiff's condition before or after the trip to Toledo:

"Q. Isn't it true that in order to ascertain the extent of osteo-porosis of the spine that is due independently to arthritis, you have to make an X-ray? A. In this case he had no history of injury or anything except pain in his back, which was growing worse, and fixation of the spine, and his occupation had him to where he could hardly work. I did not have any X-ray made because I thought it an unnecessary expense to him.

"Q. Are you in position to testify to what extent this condition was influenced or aggravated by any examination that you made of him after the accident? A. Am I in position to testify to what?

"Q. To what extent his condition was aggravated by any examination that you made of him after the accident? A. I saw him after the accident on several occasions. I saw him at his place of business and also at the office, as I have said, on numerous occasions. My opinion was that he had a progressive arthritis; that I did not think the accident had anything to do with his injuries.

"Q. You did not think that he had any kind of fracture of the spine at any time? A. No, Sir."

Dr. Lorio advised plaintiff to go to the Charity Hospital in New Orleans, but it seems that he did not go until months afterwards when he went on the advice of Dr. Sitman.

Dr. Hirsch, called by the defendant, had examined plaintiff physically and by X-ray about ten or fifteen days previous to the trial, but had never treated him. Dr. Hirsch gave it as his opinion that the plaintiff was suffering with a general hypertrophic osteoarthritis of practically the entire lumbar region, but testified that his X-ray disclosed to him a compression deformity between the first and second vertebræ, and it was his opinion that this deformity was the result of a traumatic injury. We quote part of his testimony:

"Q. Have you any explanation to make as to what caused the compression deformity which you described to exist in the first body of the lumbar region? A. I think it a traumatic affair.

"Q. When you say it is a traumatic affair, does that mean a blow? A. It means an injury.

"Q. You have no doubt on that point? A. Not in my mind, no."

Further questioned as to the cause of an extraordinary bony growth found existing on the first vertebra of the lumbar region, he answered: "I think the generalized exostosis was probably aggravated in that particular area by the injury.

"Q. Then it is your opinion, Doctor, that the exostosis which you described as the cause of the deposit which you found in the spine, even though it pre-existed the accident, was aggravated by the trauma which was received at the time the compression deformity occurred? A. That is my opinion."

As thus appears, it was the opinion of Dr. Hirsch that a condition of hypertrophic osteoarthritis existing in plaintiff's lower lumbar region had been aggravated as the result of a traumatic injury.

Dr. Williams, Dr. Cook, and Dr. Jones examined plaintiff about a month before the trial, and gave testimony from which we extract as follows:

Dr. Williams, X-ray specialist: "Q. Basing your diagnosis upon the X-ray what do you say as to the condition of Mr. Duncan's spine? A. The first lumbar vertebra shows a marked deformity. A decrease in the anterior meas-

urements near to approaching a triangle, probably the result of an injury. There is also a rather general lipping of hypertrophic arthritis in the lumbar spine, rather general and the entire lumbar spine with a bridging between the first and second lumbar vertebræ on the left side. Further questioned this physician says, the first lumbar vertebra is compressed; that the condition of the first and second vertebræ is probably due to injury.

Dr. Cook examined plaintiff about a month before the trial, read the X-ray report made by Dr. Williams and heard Dr. Williams testify. Dr. Cook was of the opinion that injury to plaintiffs first and second vertebræ is responsible for his present condition of pain and physical incapacity. He says that plaintiffs condition is called Kummells disease, a softening of the vertebra. He says that Kummells disease may be caused by a fracture. His opinion was that plaintiff's condition is due to a fracture; that the injury to plaintiffs vertebra could have resulted from being thrown up against the top of an automobile and falling back on the base of the spine, as plaintiff claimed happened to him. That bone injury of the kind might not be seen at first, but will develop, and the development can subsequently be seen by an X-ray of the injured part.

Dr. Jones says that plaintiff's trouble is due to fracture of the vertebra; that his injury may be kept from getting worse by a brace, but that his rheumatic condition will grow progressively worse. We extract from the testimony of Dr. Jones as follows:

"Q. Taking into account the degree of deformity which is disclosed in Dr. Williams' reading, what does that suggest to you as to the possibility of the original fracture? A. I believe the man had a fracture of his vertebra.

"Q. You believe that? A. Yes I do. There is no question in my mind about that.

"Q. You base that on the compression of the spine? A. Yes, I base it on the history of the case; the characteristic injury; on the reports of the X-ray that was delivered to me and on the man's condition at the present time. That is what I base it on.

Dr. Sitman, called as a witness by the plaintiff, had treated him for pain in his back before he went to New Orleans, and had also examined him about 15 days previous to the trial. Basing his opinion on his examination and on the reading of the X-ray made by Dr. Williams, he was very positive that plaintiff had sustained a traumatic injury to his first and second vertebræ, which, not having been discovered and properly treated when first received, had progressed until it had produced in plaintiff his present condition of suffering and incapacity.

Dr. Sitman, asked about Kummells disease, said: "Q. Kummells is a disease which follows a fracture? A. Yes, I think this man at the time of his injury sustained a fracture of the first lumbar vertebra and did not know it.

Summing up this medical testimony we have that of a physician who had treated plaintiff, before he entered on this trip, for a pain in the back which he took to be a rheumatic trouble, and treated him accordingly. After plaintiff's return from the trip, this physician continued to look on his trouble as the same he had before the trip. He did not have X-ray pictures made of plaintiff's lower vertebra and was not aware that a fracture existed in the first and second vertebra. The plaintiff was then treated by Dr. Moore for some months. Dr. Moore was not called as a witness, so we have no idea as to what his testimony might be.

The plaintiff was then treated for several months by Dr. Sitman who caused him to go to the Charity Hospital in New Orleans where an X-ray was made which disclosed an existing fracture of the first vertebra in the lumbar region. The operator who made the X-ray at the Charity Hospital was not called as a witness, but the X-ray afterwards made by Dr. Williams disclosed the same thing. The very decided preponderance of the testimony establishes the existence of a fracture in the first and second joints of the vertebræ in plaintiff's back. The evidence satisfies us that this fracture is the cause of plaintiff's suffering and incapacity. No other occasion, except when he was pitched up to the top of the automobile and fell back on his seat, is indicated as the cause of the fracture; consequently, we are satisfied that it was sustained as alleged by the plaintiff in his petition, although he may, in addition thereto, suffer with a rheumatic condition.

■■ Defendants contend that there was no culpable negligence on the part of Roumain in driving, such as to render a host responsible in damages to his guest.

The rule on the subject of the care which a host must observe toward his guest riding in his automobile is stated in Jacobs v. Jacobs, 141 La. 272, page 286, 74 So. 992, 997, L. R. A. 1917F, 253: "What we maintain in this case is that a man who, possessed of all his faculties and knowing that there is al-

ways some danger in traveling in an automobile, accepts an invitation to ride as the guest of the driver, assumes the risk of the ordinary dangers of which he is aware, and cannot hold the driver of the car responsible in damages for an accident, if there was no fault or negligence or imprudence on the driver's part. The driver's duty and responsibility is merely to be careful and avoid committing any act of negligence or imprudence that might add to or increase the ordinary danger of the occupation. With regard to the care due by the driver of an automobile for the safety of a passenger riding as his guest, we do not recognize the distinction referred to in some jurisdictions between gross or willful negligence and the ordinary negligence or imprudence referred to in the provisions of our Civil Code, arts. 2315 and 2316. We agree with the doctrine recognized by the Court of Appeals of Kentucky * * * that a guest in an automobile is entitled to demand that his host shall exercise ordinary care for safety in driving the car, and that the latter's liability is not confined to acts of gross negligence or willful recklessness."

In Cyclopedia of Automobile Law by Huddy, vol. 5-6, subject, Guest and Passenger, page 222 et seq. § 132, the rule is said to be as follows: "In most jurisdictions ordinary or reasonable care measures the duty of the driver to those who entrust themselves in his vehicle. The express or implied duty of the owner and driver to the occupant of the car is to exercise ordinary or reasonable care in its operation and to not unreasonably expose him to danger by increasing the hazard of that method of driving. He must exercise the care and diligence which a man of reasonable prudence engaged in like business would exercise for his own protection and the protection of his family and property; a care which must be reasonably commensurate with the nature and hazards attending the particular mode of travel. Failing in this duty he will be liable to the occupant or guest in the car for injuries which are the result of such carelessness or lack of diligence."

■ Defendants contend that Roumain, Maggio, and Pedare are all well-wishers of the plaintiff in this suit, and that their friendship for him influenced their testimony. We are satisfied that they are plaintiff's friends and well-wishers, and we have that fact in mind in giving weight to their testimony as to every matter concerning which Roumain and Maggio have testified.

Roumain, questioned about his driving, admits his negligence:

"Q. As I understand it you admit that you were negligent in driving the car that day and causing this accident? A. It was my fault, and I guess if I had been taking particular notice it would not have happened.

"Q. You admit it was your negligence? A. I admit that.

"Q. You were not sued by Mr. Duncan? A. No, I was not sued by Mr. Duncan.

"Q. Yet you admit you were negligent? A. I was talking to Tony when it happened. I guess if I had seen this thing I would have stopped."

Further questioned, he testified that he had been looking ahead just before the accident, but did not see the rut until after he had run into it; that the rut was full of dust and was not noticeable, and that nothing indicated its presence in the road; that if he had seen it he would have stopped; that he was talking to Maggio and nobody called his attention to it.

Maggio, seated on the front seat, says that he saw the rut about 12 or 15 feet distant; that Roumain was talking to him; that he presumed that Roumain had seen it, and that if he had been driving he could have slowed down before he got to it.

According to Roumain, if he had been taking particular notice, the accident would not have happened, and if he had seen the rut he would have stopped, etc. According to Maggio, the rut was not a concealed or unknown danger which the driver of the automobile could not foresee and had no right to expect, but was an object ahead obvious to the view and plainly visible to the eye of one paying attention, and could and should have been seen by Roumain in time to have slowed down and avoided striking it. We do not find any fact or circumstance which renders the testimony of Roumain and Maggio on this subject unbelievable. A fracture is found and it is not otherwise accounted for. We conclude that their testimony concerning the negligence and want of care on the part of Roumain while driving in this detour is true, and we therefore give it effect and act on it accordingly.

It was broad daylight and the dirt detour, the temporary highway, full of dust, was in itself a warning to drive slow and keep a careful lookout ahead so as to be able to stop or slow down within the distance which an object in the road ahead could be seen in time to avoid it.

It is our conclusion that there was such culpable fault, carelessness, and negligence on

the part of Roumain in not seeing this rut or ditch and in driving into it at a speed which caused the automobile to rebound with such force as to injure the plaintiff, and to render the defendants liable to him in damages for the injuries sustained.

The injury was received on August 6, 1931, but formal notice of the accident was not received by the United States Fidelity & Guaranty Company, nor by Pedare until April 13, 1932, which was 8 months and 7 days afterwards.

The defendants contend that this delay on the part of the plaintiff in giving notice of his injury releases them from liability.

This defense is based on a stipulation in the policy which provides: "Immediate written notice of any accident with the fullest information obtainable at the time must be forwarded to the home office of the company or its authorized representative. If a claim is made on account of such accident the assured shall give like notice thereof, and if suit is brought to enforce such a claim the assured shall immediately forward to the company every summons or other process as soon as same shall be served on him."

Another stipulation is as follows: "If the limitation of time for notice of accident or for any legal proceedings herein contained is at variance with any specific statutory provision in relation thereto in force in the state or province in which it is claimed, the assured is liable for any such loss as is covered hereby and such specific statutory provision shall supersede any. contention in this policy inconsistent therewith."

The law governing the rights of the assured, assurer, and injured party under a policy of this kind is Act No. 253 of 1918 (amended Act No. 55 of 1930). This act provides: "After the passage of this act, it shall be illegal for any company to issue any policy against liability unless it contains a provision to the effect that the insolvency or bankruptcy of the assured shall not release the company from the payment of damages for injury sustained or loss occasioned during the life of the policy, and any judgment which may be rendered against the assured, for which the insurer is liable, which shall have become executory, shall be deemed prima facie evidence of the insolvency of the assured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person or his or her heirs against the insurer company. Provided further that the injured party or his or her heirs, at their option, shall have a right of direct action

against the insurer company within the terms, and limits of the policy, in the parish where the accident or injury occurred, or in the parish where the assured has his domicile, and said action may be brought either against the insurer company alone or against both the assured and the insurer company, jointly and in solido. Provided that nothing in this act shall be construed to affect the provisions of the policy contract if the same are not in violation of the laws of this State. It being the intent of this act that any action brought hereunder shall be subject to all of the lawful conditions of the policy contract and the defenses which could be urged by the insurer to a direct action brought by the insured; provided the term and conditions of such policy contract are not in violation of the laws of this State."

The subject, "Immediate written notice," contained in a policy of this kind has received the attention of text-writers. We copy from Cyclopedia of Automobile Law by Blashfield, vol. 3, subject, Liability Insurance, § 36, p. 2662:

"It being understood that the word 'immediately' does not mean instantly, but that it is to be construed as meaning within a reasonable time after the insured has learned of the accident, having regard to all the circumstances, provided he has exercised reasonable diligence to acquire such information. Under such a provision a delay of 3 months in giving notice to the insurer whose office is but 25 or 30 miles away, there being daily mails, has been held unreasonable.

"It is some times a disputed question as to whether the accident has happened within such a provision demanding such notice. It is not every trivial mishap or occurrence that the insured under such a policy must regard as an accident of which notice should be given immediately to the insurer, even though it may prove afterwards to result in serious injuries.

"Accordingly, under a policy covering only bodily injuries accidentally suffered by a third person through operation of an insured car in a case where no bodily injury is apparent at the time of the accident in question and there is no reasonable ground for believing that a claim for damages against the insured will arise therefrom, he is not required to give the insurer notice until the subsequent facts as to an injury would suggest to a person of ordinary and reasonable prudence that liability on the part of the insured to the injured person may arise. Under such circumstances the duty of the insured owner is per-

formed if he gives notice within a reasonable time after the injury presents an aspect suggestive of a possible claim for damages."

From Cyclopedia of Automobile Law by Huddy, vol. 13–14, subject, Notice and Proof of Loss, § 154, p. 186 et seq., we copy as follows:

"The terms 'forthwith' and 'immediate' as used in the provision of insurance policies requiring notice, do not mean instantly, but that the assured in the exercise of due diligence will give notice within a reasonable length of time. The provision should be liberally construed and means that notice may and must be given within a reasonable time under the circumstances of each particular case. If the assured acts with due diligence and without unnecessary and unreasonable delay the requirement will be met.

"There may be circumstances that will explain or excuse the delay and show it to be reasonable. The question of the sufficiency of the excuse offered and the reasonableness of the time in which the act is to be performed, is to be determined according to the nature and circumstances of each individual case. Forgetfulness or negligence is no excuse for delay."

■■ Looking at Act No. 55 of 1930, we understand that the word "terms" used in the act has reference to the conditions of the policy, and that the word "limits" refers not only to the amount of the policy, but to the time in which notice of the accident must be given. We also understand that the act gives to the injured party the same rights given to the assured, but does not impose on the injured party the duty to give the statutory notice of the accident which causes him injury. This duty under the policy and the statute which recognizes the policy contract is imposed on the assured only.

The Court of Appeals so held in Edwards v. Fidelity & Casualty Co., 11 La. App. 176, 123 So. 162. The defense contends that it was held differently in Howard v. Rowan et al. (La. App.) 154 So. 382, and Jones v. Shehee Ford Wagon & Harness Co. (La. App.) 157 So. 309. These two cases last mentioned do hold that when delay in giving notice bars recovery on the part of the assured, the same delay will bar recovery on the part of an injured person.

The case Dennis Sheen Transfer v. Georgia Casualty Co., 163 La. 969, 113 So. 165 deals with the result of delay on the part of the assured only, and the situation was not the same as in the present case.

In the present case the plaintiff Duncan was not aware that his lower vertebra had been fractured and that his suffering and incapacity had resulted therefrom until the fact was established at the Charity Hospital. He was received in the hospital on March 3, 1932, and remained there until the 18th of the same month. While there an X-ray made of his lumbar region disclosed the fracture. When Roumain drove into the ditch or rut in making the detour, plaintiff cried out that his back was broken, and immediately, by words and conduct, made it known to his companions that he had sustained a serious injury. Pedare and Roumain and Maggio were all present, saw him, heard him, and heard his numerous complaints of pain on the trip and after his return, but certainly the plaintiff and Pedare cannot reasonably be supposed to have had grounds for suspecting that his pain and growing incapacity was due to a fracture of the vertebra, when all of the physicians he consulted were of the opinion that his trouble was due to a rheumatic condition, and had presumably advised him accordingly.

No action in damages could arise against Pedare when plaintiff's trouble was due to rheumatism.

■ A witness named O'Brien testified that when plaintiff got back from his trip he worked for a while at his trade, thinking his back condition was due to a strain. Certainly a person cannot be expected to give notice of something he does not know to exist and has no reasonable grounds for supposing to exist. Certainly Pedare could not be expected to send notice to his insurer that Duncan might sue him for damages, when he had no more reason than had the plaintiff for supposing that plaintiff's condition was the result of a fracture of his vertebra received in the detour. He was not informed as to the nature of plaintiff's trouble until the fracture was brought to light by the X-ray made at the Charity Hospital and plaintiff had made demand on him for damages. The evidence shows that as soon as plaintiff returned from the hospital he consulted counsel and on April 11, 1932, his counsel made demand on Pedare, and on April 13, 1932, Pedare formally communicated the demand to United States Fidelity & Guaranty Company. In the Edwards Case, eleven months elapsed before notice was given. In the present case, counting from March 18, 1932, plaintiff gave Pedare notice 26 days after he was made aware of the fracture he had sustained, and Pedare gave United States Fidelity & Guaranty Company notice two days afterwards, which was 8 months

and 7 days after plaintiff had received the injury. In the present case, under the facts and circumstances developed, we think plaintiff gave Pedare notice within a reasonable time after his injury was discovered, and that Pedare gave like reasonable and timely notice to United States Fidelity & Guaranty Company, and that the defense, that delay in giving notice has released defendants from liability to the plaintiff, is not well founded.

■ The plaintiff answering the appeal prays that the judgment be increased from $4,000 to the amount claimed in his petition. The evidence shows that plaintiff had pain in his back, due to a rheumatic condition, for a year or so previous to the trip, in making which he sustained a fracture of his vertebra. But the evidence indicates that previous to the time he sustained this fracture he only suffered at times and then not severely, and was always able to work at his trade. But after he returned from his trip to Toledo a great change was noticed in his physical condition. He stooped over, and his condition in that respect grew worse. His suffering is steady, and, according to the medical testimony, there is to be no relief. According to Dr. Jones, there may be some improvement; others do not think so. Dr. Jones, questioned concerning the result of the fracture, gave the following opinion: "Q. You say that this condition is going to become worse? A. I think it will come progressively worse from what it is at the present time until there is complete immobilization from the hypertrophic arthritis. That after it has become complete and the ankylosis or immobilization of the region has been completely and thoroughly established, why I believe his discomfort will grow less."

Later, he testified that plaintiff's spine would become as rigid as an iron bar.

Two other physicians testify that plaintiff's back will become rigid as a result of his condition, and will remain so as long as he lives.

The plaintiff testified:

"Previous to this accident my health seemed to be very good. There was a time about 9 months previous to the accident that I had suffered with a back ache. One night in talking with Dr. Lorio I mentioned the fact that I felt my back troubling me a little, and he never offered to treat me in any way for it, but Dr. Sitman did examine me and gave me some tablets which I think were for rheumatism. He said it was arthritis.

"Q. That was before the accident? A. That was about 9 months previous to the accident.

"Q. During the 9 months immediately preceding the accident did you suffer any with your back? A. Not much.

"Q. Did you at any time prior to this accident suffer in any other accident? A. No, Sir.

"Q. To what extent had you been impaired at any time previous to this accident? A. I never had been impaired as a mechanic at any time. I was always able to work."

Plaintiff's testimony as to his ability to work prior to the accident is not contradicted. The testimony indicates that he was working at his trade up until the time he started on the trip. It seems reasonable to suppose that a man would not have undertaken a pleasure trip in an automobile from Baton Rouge to Toledo, Ohio, a distance of close to a 1,000 miles, unless he had felt himself to be in good health and able to enjoy the trip. The evidence shows that plaintiff has been to much expense on account of his injury for the employment of physicians, on account of medicine, and other expenses necessary in his effort to obtain relief. The exact amount expended in this way cannot be determined from the evidence.

The lower court allowed $4,000, without saying what part of it was for suffering, what part for loss of earning power, and what part, if any, was on account of doctor's fees, medicine, and other expenses made necessary as a result of his injury.

After considering the matter, we have decided that the plaintiff is entitled to have the amount increased to $5,000. The additional $1,000 is to take care of the expenses to which he has been forced to undergo on account of his injury, and at the same time increase the amount allowed on account of suffering for permanent incapacity.

For these reasons, the judgment appealed from is amended. The amount allowed in the lower court is increased to $5,000, and, as thus amended, the judgment appealed from is affirmed; defendants-appellants to pay the cost in both courts.