## COON v. MONROE SCRAP MATERIAL CO. et al.

### No. 5901.

Court of Appeal of Louisiana.
Second Circuit.

May 29, 1939.

Rehearing Denied July 17, 1939.

Certiorari Denied Oct. 30, 1939.

A. B. Parker, of Minden, for appellant.

Theus, Grisham, Davis & Leigh, of Monroe, for appellees.

TALIAFERRO, Judge.

Plaintiff's husband, Webb Coon, colored, was killed and several other persons were injured when a truck, owned by defendant and then being driven by a colored man by the name of Willie Raimy, collided with the rear end of another truck, in the possession of and being driven by Wiley Richardson, on highway No. 80, some two miles west of the town of Rayville, La. The accident occurred about midnight October 1, 1937. Both trucks were headed easterly.

This suit to recover damages is pitched upon the theory, supported by appropriate allegations, that at the time of the collision Raimy was the agent or servant of the defendant, a commercial co-partnership; was on a mission for it and was acting within the scope of his employment.

It is alleged that the accident happened because of gross negligence and carelessness of Raimy in that he was driving recklessly without maintaining a proper lookout for traffic ahead of him, and drove his truck off of the paved portion of the road onto its shoulder and collided violently with the Richardson truck which was then parked thereon.

The Monroe Scrap Metal Co. and its copartners, Meyer Weldman and Louis Falk, were made defendants. We shall herein refer to them as "appellee" or "defendant."

Defendant admits the accident, the death therefrom of Webb Coon and its ownership of the truck then driven by Raimy. It denies specially that the deceased was the lawful husband of plaintiff and denies that Raimy was its agent or servant at the time.

In the alternative, defendant alleges that the Richardson truck was illegally parked on the highway, to the knowledge of Webb Coon, at a time when, on account of fog and rain, visibility was poor, and without lights and flares as required by law; that in these circumstances the Richardson truck was unavoidably run into with the results above mentioned. These alleged acts of negligence on the part of Richardson and knowledge thereof by the deceased, are used as the basis of a plea of contributory negligence urged to preclude plaintiff's recovery.

The lower court reached the conclusion that Raimy was not the agent, employee or servant of the defendant when the accident occurred and for this reason alone rejected

the plaintiff's demands. She prosecutes this appeal therefrom.

In this court, appellee discusses and briefs at length only the point upon which the lower court based its judgment. That point is, of course, pivotal of the case. Around it revolves all other issues raised by the pleadings and testimony. The facts bearing upon or relevant to the issue of agency are in the main not disputed. The legal deductions and conclusions to be drawn therefrom are subjects about which the parties are diametrically opposed.

Defendant is domiciled in the city of Shreveport, La., and at date of the accident had a branch office in the city of Monroe, La. As its title indicates, it is engaged in the purchase and selling of scrap material, principally, if not exclusively, iron. Its business activities cover a large territory in three states, which requires considerable capital and equipment, including a fleet of large motor trucks. These trucks with other equipment are entrusted to various persons, with headquarters at different places, who use same in gathering and assembling scrap iron for shipment for defendant's account, when and where it directs.

In February, 1937, defendant arranged with Mr. Esir Ablon, of Monroe, to go to Winnsboro, La., and purchase and assemble there large quantities of scrap iron. Defendant furnished him with a large truck, free of charge, and with an acetylene lamp, drums of oxygen, and other equipment needful to the handling and loading of heavy pieces of iron. He was authorized to draw on defendant without restrictions for money necessary to pay for the material purchased and incidental expenses. He hired and paid his helpers. From March 22 to November 1, 1937, the Winnsboro Junk Company, by Ablon, made 128 drafts on defendant at Monroe, La., aggregating over Four Thousand Dollars, all of which were paid. These were charged to Ablon's account.

The material was assembled on a lot in Winnsboro and shipped, on orders from defendant, for its account, in car load lots to persons and places designated by it. The proceeds of the sales were paid directly to defendant and Ablon's account credited with a definite amount per ton of iron shipped as had been previously agreed upon. Ablon knew in advance of purchases by him, the exact price per ton defendant would allow him for the material, and at intervals, after two or three cars had been shipped, a balance of the account would be struck. This modus operandi continued until the fall of 1937 when the market for the material became demoralized and defendant suspended buying. The truck and equipment were then returned to defendant.

The truck, at time of the accident, was returning from Monroe where it had been sent by Ablon to deliver some empty oxygen tanks to defendant and to procure from it a tip for a cutting torch, through which fire from the acetylene lamp emitted.

Defendant contends that Ablon's relation to it, reflected from the foregoing epitome of the facts, was that of independent contractor, while plaintiff's position is that the facts establish a relationship of principal and agent or master and servant, between them.

Ablon was simply employed to buy, assemble and ship the material for defendant's account. Defendant furnished the equipment to enable him to discharge the duties of the employment and provided him with funds, through the payment of his drafts, necessary to acquire the material. This relationship was subject to termination of either party at will. He was subject to transfer from one location to another by defendant so long as he used its equipment. He was not free to dispose of accumulated material to anyone save defendant. These conclusions are strengthened by the following statement of Mr. Weldman, one of the two partners of defendant, viz.:

"The only way we have of buying material is putting out fellows in various towns to gather up the stuff."

And he adds, that his company finances these "fellows" in order that they may be able to acquire "the stuff."

It is true, as argued, that defendant did not have immediate supervision nor direction over the details of Ablon's personal movements in locating, purchasing and hauling the material to the assembling yard, but this does not materially effect the status of their relation as master and servant. He was told what to do and he did it. That is true of almost every employment. The master of many servants cannot give immediate attention to all of them simultaneously. At best, he may only instruct them severally the duties they are engaged to perform and leave the details to them, respectively.

**610**

The adoption of the title "Winnsboro Junk Co.," for use at the Winnsboro yard may not have originated through Ablon. The drafts made by him were all signed:

"Winnsboro Junk Co.
"Esir Ablon"

But we find in the record three other drafts drawn on defendant in March, 1937, after Ablon began business at Winnsboro, which are signed:

"Winnsboro Junk Co.—Leon H. Kaplan"

Kaplan was afterwards transferred from Winnsboro. This indicates that this title was, for purposes best known to the parties, employed to cover operations in the Winnsboro territory and, apparently, regardless of the person in charge of the business there.

Another significant fact is that the morning after the accident Ablon stated to a deputy sheriff in Rayville and others that he was working for the defendant and was foreman of its business at Winnsboro, and was buying scrap iron for it.

It is also of some significance that the offending truck bore on its sides, in large, bold letters, the partnership name, and for the period in Ablon's possession, nearly ten months, public liability insurance thereon was carried in the owner's name. There is no intimation that the expense of such insurance was charged in whole or part to Ablon. If such was done, doubtless, proof of the fact would have been offered.

■ Ownership of a motor vehicle at fault in an accident, does not necessarily cinch responsibility for results upon the owner; but an inference of responsibility arises from proof of such ownership. This inference, dependent upon the character of the proof supporting or traversing it, grows stronger or weaker. And when such proof, as is true in this case, goes far towards establishing that the operator of the offending vehicle was on a mission for the owner, the inference takes on a status nearly, if not wholly, equal to conviction, to overcome which evidence of unusually strong and convincing character needs to be adduced.

■ Appellee carried the burden of proving its special defense that Ablon's relation to it was that of an independent contractor. E. C. Taylor & Co. v. New York & Cuba Mail S. S. Co., 159 La. 381, 105 So. 379; Goetschel v. Glassell-Wilson Co. et al., 13 La.App. 424, 127 So. 81; 14 R.C.L. 78.

We had occasion to deal with this question in Jones v. Shehee Ford Wagon & Harness Co., reported in 157 So. 309, the facts of which are somewhat similar to those now before us. It was held therein:

"Salesman who, at time of accident, was engaged in employer's business and performing duties he was employed to perform, who was driving employer's automobile with gasoline and oil furnished by employer who had right to direct salesman's actions held 'servant' and not 'independent contractor,' and hence employer was liable for injuries caused by salesman's negligence."

■ It is fundamental to the existence of this relationship that there must be absolute independence of action on the part of the contractor in the execution of the work assumed by him. If the contractee has the power to interfere with or control the manner of execution or performance, then the contractor ceases to be independent. His status degenerates into that of an employee or servant. See Gallagher v. Ricketts, La.App., 187 So. 351.

■ In the present case, as touched upon supra, defendant unquestionably had the power to direct and control Ablon in the performance of the weightier phases of his duties. It will not do to say that one who supplies all the equipment needed in the performance of services of the character we are discussing, and who advances the cash money indispensable to the successful conduct of the work, has not the inherent power to wield a deciding and controlling influence upon the person doing the work. He is wholly dependent upon the will of his employer because, without the financial assistance and the free use of the equipment, the work could not be performed. See: Dinet v. Orleans Dredging Co., Inc., La. App., 149 So. 126; Goff v. Sinclair Refining Co., La.App., 162 So. 452.

We are convinced from a diligent study of the record that the defense of independent contractorship has not been established; rather, the record discloses that Ablon was the agent or employee of defendant and that Raimy was its sub-agent, whose services Ablon had the implied power to engage in the furtherance of the master's business. To operate the truck, load and unload heavy pieces of iron, ofttimes requiring dismembering by an acetylene torch, perforce demanded the physical efforts of

more than one person. Defendant well knew this to be true.

Under the title of Mandate, its nature and form, appears Article 3000 of the Civil Code, which reads, viz.:

"Powers granted to persons, who exercise a profession, or fulfill certain functions, of doing business in the ordinary course of affairs to which they are devoted, need not be specified, but are inferred from the functions which these mandataries exercise."

Using this article as a predicate, this court held in Smith v. Howard Crumley & Co., 171 So. 188, 189, as follows:

"Salesman required by dealer to own automobile held impliedly empowered to allow prospective buyer to drive such automobile for demonstration purposes, making dealer liable to guests in other automobile involved in collision."

■ Vol. 2, C.J.S., Agency, page 1359, §§ 135, 136, Verba Subagents, expresses the rule thus:

"As a general principle, where it is essential to the proper transaction and carrying on of the business committed to the agent, as where the extent of the agent's duties makes such assistance necessary, the agent has implied authority to appoint a subagent; and, if the circumstances connected with the transaction are such that the principal must have reasonably known that duties involving discretion and ordinarily nondelegable would have to be delegated by his selected agent to a subagent, such principal is bound by the act of such subagent in the exercise of such discretion."

■ The gas supply of the Wiley Richardson truck became exhausted and it was driven from the paved portion of the highway and parked on its right (south) shoulder. The left wheels were parallel to and two feet or more from the pavement. Flares were set on its left side and in front and to its rear a sufficient distance to meet legal requirements. A supply of gas procured at Rayville by Richardson and another man was put in the tank. The motor was started. Richardson was at the wheel for the purpose of resuming the journey eastward. The earth shoulders were slick from rain and the wheels began to spin. At this juncture Webb Coon and his brother, Henry, afoot, coming from Rayville, appeared upon the scene. They fell in behind the truck and with others began to shove it forward. The flares were still out. While this was being done the truck was run into from the rear by defendant's truck, moving at very rapid rate of speed. It is shown that defendant's truck's right wheels left the pavement 40 feet or more before reaching the Richardson truck. Necessarily, this had to be done to bring about the collision. Had it remained on the pavement, and there appears no valid reason for not so doing, there would have been no collision. Therefore, it appears beyond debate that the accident and its tragic results may be solely accredited to the negligence and carelessness of Raimy, the driver of defendant's truck.

■ We think the record establishes plaintiff's capacity as the lawful widow of the deceased. They were married in Richland parish on December 30, 1922.

It is charged that this marriage, because of its alleged bigamous character, is null and void. It is asserted that when contracted, Coon had a living wife, viz.: Ida Smith, from whom he had not been divorced. This fact has not been proven, but if the testimony adduced to establish the fact should be accorded the weight contended for, it could have no decisive bearing upon the issues herein because it is also proven that at the date it is asserted that Ida Smith married Webb Coon she had a living husband from whom she was not then divorced. In these circumstances, there was legal impediment to her right to marry anyone.

■ A mass of testimony was adduced on the issue raised by defendant that plaintiff and Coon had in fact separated some three years before his death and were living apart at the time. This contention, with certain qualifications, is not sustained by a preponderance of the testimony. It is clearly shown that the parties lived together regularly until the year 1934. They had no children. Times were hard, due to economic conditions, and they found it difficult, if not impossible, to remain together daily and at the same time earn a livelihood. He worked on farms and when killed was employed by a dairyman four miles west of Rayville. For nearly three years before his death she cooked for another negro man, a railroad employee, in Rayville, for a stipulated wage, but spent the larger part of her time, especially

**612**

nights, in the house of her mother; not over three blocks away. It is shown that she and the deceased cohabited weekly and that he supplied her with cash money from time to time as his financial condition would allow.

It may be, as defendant strongly insinuates, that plaintiff did not at all times meticulously observe the moral code, but, even if true, such conduct, in view of all the circumstances and other facts well proven, would not close the door to her right to stand in judgment as the surviving widow of Coon, who was killed without cause or excuse. It is shown that she and Coon were congenial companions, enjoyed each others company and often attended religious services together. It is also shown that she was very much affected on learning of his death, cried freely, and for some time thereafter evinced signs indicative of genuine grief over his passing.

■ Webb Coon, when killed, was 36 years and 7 months old. He was physically sound, though illiterate and of limited earning power. It appears that he was reared on a farm and followed farming almost entirely for a livelihood. After his marriage to plaintiff, he changed landlords quite frequently, which indicates lack of ability on his part as a farmer, or a restless disposition. It goes without saying, that an illiterate person so engaged or so disposed, has small opportunity to earn more than a bare subsistence; certainly, he is impotent to accumulate much of material substance.

Plaintiff sues for loss of support, for grief and for mental distress suffered by her, and for funeral expenses. No proof of amount incurred for the latter item was adduced.

All things considered, we are convinced that an award of Five Thousand Dollars will be adequate. For a review of the array of cases wherein surviving widows were awarded damages for the death of the husband, see Johnson v. Hibernia Bank & Trust Co., 5 La.App. 649.

For the reasons herein assigned, the judgment appealed from is annulled, reversed and set aside, and there is now judgment in favor of plaintiff, Estelle Coon, and against defendants, Monroe Scrap Material Company, Myer Weldman and Louis Falk, insolido, for the sum of Five Thousand and No/100 ($5,000) Dollars, with legal interest thereon from judicial demand herein, and for all costs.