This suit involves a claim for damages against the two defendants, Travelers Insurance Company and J.C. Leathers, on behalf of the plaintiff, Julius C. Olano, for himself, individually, in the sum of $1,798.80, for the use and benefit of his minor son, Julius C. Olano, Jr., in the sum of $9,500 and for the use and benefit of General Exchange Insurance Corporation in the sum of $800. The demands arise out of an accident which took place on State Highway No. 168 at a point about one-half mile north of the Town of White Castle, Parish of Iberville, at about 9:30 o'clock in the morning of Sunday, November 20, 1938. In the automobile with plaintiff at the time was his young son, J.C. Olano, Jr., aged twelve years.
Plaintiff was driving his Pontiac automobile south on the highway and on reaching the point where it is intersected by a side road running from the Mississippi River, westward, to the Cedar Grove Plantation, his car collided with a truck loaded with shells, which was being driven by John Roshto, alleged to have been an employee of J.C. Leathers, one of the defendants. The Travelers Insurance Company, alleged to have been the insurer against liability under a policy of insurance *Page 488 
which applied to the truck involved in the accident, is made a party defendant with the said J.C. Leathers and judgment is prayed for against them both, in solido, for the full amount of the damages sought to be recovered.
In his petition plaintiff alleges that he was driving his car carefully at forty to forty-five miles per hour and on nearing the intersecting road saw a truck approaching on the side road from his left at a rate of speed which he estimated to be from twenty-five to thirty-five miles per hour; that there was nothing in the manner of the operation of the truck which suggested to him that the driver was ignoring his presence on the highway nor did its speed indicate at any time that it would be impossible for the driver to slow down or even stop in time to yield the right of way to traffic on the highway. He avers that it was only when he was close to the intersection that he realized for the first time that the truck driver was not going to slow down or stop and that at that moment he applied his brakes, steered his car over to the right, almost completely off the paved portion of the highway, but was unable to avoid the collision. He charges the driver of the truck with negligence in failure to observe and respect the right of way which was his in two particulars: (1) He was on the favored road and (2) he was approaching the intersection from the truck driver's right hand side. He also charges him with negligence in not keeping a proper lookout and in not having his truck under control so as to be able to stop it on approaching a right of way road with traffic on it at all times which, to his knowledge, required such action on his part.
Plaintiff claims to have suffered a concussion of the brain which resulted in unconsciousness lasting for the greater part of three days; he also sustained a deep laceration over his left eye which became infected and left a permanent scar and also contusions and abrasions over his entire body. As a result of his injuries he lost ten days' work as pilot on a ferryboat operating between Baton Rouge and Port Allen, his wages for that time amounting to the sum of $64.80. His car was a total wreck and its loss is valued at $850, of which amount $800 is claimed for the use and benefit of the insurer, as already stated, and $50 is claimed by him as the loss sustained by him because of the deductible clause carried in the insurance policy.
Plaintiff avers that his minor son suffered a severe injury to the left side of his forehead and of his skull, a deep cut below his right lip, contusion of the nose and of the tongue, abrasions over several parts of his body and severe injuries to his teeth.
For his own injuries, pain and suffering, plaintiff asks for $1,200 and for those of his minor son, as well as for the latter's alleged permanent disabilities, he asks $9,500. In addition he claims medical, hospital and nursing bills already incurred to the amount of $184 and for such bills of a similar nature as are further anticipated, $250.
Both defendants filed a joint answer in which it is admitted that a collision between the truck and the automobile occurred at the time and place alleged in plaintiff's petition but the manner in which it happened as therein set out, is denied. It is averred that the driver of the truck was proceeding in a careful and prudent manner and had pre-empted the intersection and that the cause of the accident was the gross and wanton negligence of the plaintiff in driving his car at a speed in excess of fifty miles per hour which made it impossible for him to exercise sufficient control over it to respect the truck driver's right of way by virtue of its pre-emption of the intersection, and avoid colliding with it.
As a further defense it is averred and urged that John Roshto, the driver of the truck, was not an employee of the defendant, J.C. Leathers, but was employed by and driving a truck belonging to one Jake Edwards who was an independent contractor. It is set out in detail in the answer that the defendant, Leathers, had contracted with the Louisiana Highway Commission for the construction of a shell or gravel road project and that he had let the contract for hauling and delivering the shells to be used to the said Jake Edwards who used his own trucks and employed his own drivers, among whom was the one driving the truck involved in this accident, and who was acting under his supervision, direction and control. As a further defense in behalf of Travelers Insurance Company, it is urged that the policy of insurance on which plaintiff seeks to hold the defendants liable does not apply to the accident as alleged to have happened in this case, *Page 489 
for reasons which are set out in the answer at great length.
The defendant J.C. Leathers filed a separate answer in which he pleads the same defenses as are pled in the joint answer, omitting however the one urged on the ground that the policy of insurance issued by his co-defendant does not cover the accident which took place and in which, in addition, he pleads contributory negligence against the plaintiff, in the alternative.
After trial in the Court below there was judgment in favor of the plaintiff and against both defendants, in solido, as follows: for plaintiff, in his own behalf, in the sum of $500 for his injuries, pain and suffering, $57.60 for loss of wages, $250 for medical, hospital and nursing expenses and $50 representing the amount which was deductible from the insurance paid him for the damage to his automobile. It was shown that the wreck of the car had a salvage value of $135 so plaintiff was allowed the sum of $665 for the use and benefit of the insurance company which had paid him his loss. For the use and benefit of his minor son, for his physical injuries, pain and suffering, loss of teeth, permanent cosmetic defects and disabilities he was awarded the sum of $1,500. Both defendants have appealed and plaintiff has answered the appeal asking for an increase in the amount of the awards for personal injuries and suffering to both himself and for the use and benefit of the minor.
There is no dispute with respect to the relation which the two roads bear to each other. Highway No. 168 is a paved road leading from Port Allen to Donaldsonville, Louisiana, whereas the cross road on which the truck was running is a short road leading from the gravelled road along the Mississippi River to the tramway or "dummy railroad track" as it is referred to in the testimony, on the Cedar Grove Plantation. It is a dirt road which, it appears from the testimony, the defendant Leathers kept graded during the whole time of the work on the project in order to make sure that it could be used in all kinds of weather. According to some measurements made for the trial of this case, it is hardly a half a mile long. It is sometimes referred to as the Cedar Grove road or the Richland road and is listed in the State system of highways under No. 253. There is no question however about the by far greater importance of Highway No. 168 and that traffic on it enjoys the right of way over that on the less important road.
Mr. Olano, who incidentally was the only eye witness to the accident who testified, freely admits that he was travelling at about forty-eight to fifty miles per hour when he was about one hundred fifty yards away from the intersection. In view of the relative importance of the two roads and it being broad daylight in the forenoon, we do not think that at that moment it can be said that he was driving at an excessive rate of speed. When he was about that distance, or perhaps a few yards less, from the intersection, he saw the truck which Roshto was driving, approaching from his left. He estimates the speed of the truck at some thirty to thirty-five miles per hour and saw nothing in the manner in which it was being operated which led him to believe that the driver was not giving his full attention to what he was doing and that he would not stop or slow down before coming into the main highway. It was only when he was about forty or fifty feet away that he realized that he was not going to do either, and he then pulled his car over to and on the shoulder on his right or on the west side of the highway, applying his brakes at the same time, all in order to try to avoid the accident. The truck drove right on however and struck his car on the left front fender when he was at a point in the southwest corner of the intersection. He was rendered unconscious at the moment of the impact and does not remember what happened afterwards.
Several persons came upon the scene of the accident within a few minutes and they described the position of the two vehicles in pretty much the same manner. The truck had turned over in the southwest portion of the intersection, its front facing almost east, which was the reverse of the direction in which it was going, and the automobile was lying in a ditch on the west side of the paved highway at a point variously estimated to be some twenty-five to sixty feet south of the intersection. There is some testimony to the effect that it had ploughed through the embankment of the ditch and counsel for defendant stress this and also the distance it travelled after the impact as proof of the high rate of speed at which it must have been going. The preponderance of the testimony, we believe, shows that the car went some *Page 490 
forty feet after the impact and it would seem entirely probable that an automobile travelling at the rate of forty to fifty miles an hour after being struck on its side by a moving object weighing about four tons going at thirty miles an hour, would go that far even if it was scraping the embankment of a ditch in which it had been thrown.
As we have already stated we do not believe that the speed at which the plaintiff admits he was going was unreasonable under the circumstances and neither do we believe that it contributed to or was a cause of the accident. There is no positive proof as to which of the two vehicles entered the intersection first. Most probably they entered about the same time for the impact took place at a point well past the center of the intersection as indicated by the quantity of shells thrown from the truck in the collision and found near the corner on the southwest. The damage to the automobile shows that it must have been struck on its lefthand side by some front end part of the truck and the position of the truck after the accident tends to indicate an effort on the part of the driver to turn sharply to his right on realizing that he was on his left hand side of the road in the intersection and about to run into the automobile.
The physical facts, as we view them, corroborate plaintiff's testimony to the effect that the driver of the truck seemed to have had no idea of or even any concern about the right of way of traffic on the paved highway and heedlessly and recklessly drove into the intersection without even slowing down the speed of his truck and ran into the automobile after the latter was well beyond the center. Not only did plaintiff have the right of way of the favored road but he also had it as he was approaching the intersection from the other driver's right (Act 286 of 1938, Paragraph 3, Rule 11) and in either case he could assume that the latter would respect his rights and permit him to proceed across. On this branch of the case we have concluded that the collision was caused by the negligence of the driver of the truck and that there was no contributory negligence on the part of the plaintiff.
We come next to consider the question whether or not John Roshto, the driver of the truck, was working for a man who was an independent contractor, in which event neither defendant would be responsible for the injuries and damages which resulted from his negligence. Undoubtedly he was not employed directly by the defendant J.C. Leathers, and it becomes necessary to determine the relationship which existed between that defendant and Jake Edwards, his immediate employer.
We find the facts as developed on this point to be as follows: J.C. Leathers had entered into a contract with the Louisiana Highway Commission covering State Project No. 1269 which involved the grading and surfacing with shells of a road on Cedar Grove Plantation beginning at a point not far west from the intersection of the river road and paved highway No. 168 and running westward from that point. By the terms of the contract, the principal items of work therein embraced, Leathers had to "perform with his own organization and with the assistance of workmen under his immediate superintendence." There was a time limit fixed for completion of the work and penalties provided for in default thereof.
Leathers had arranged for the delivery of the shells to be used by barge on the Mississippi River at a point nearly opposite that where the Richland road intersects the highway along the levee. From the barge they were to be loaded on trucks by means of a hopper and then transported to the site of the project where they had to be dumped and laid under directions there given to the drivers of the trucks by one of Leathers' men. The project called for moving about four thousand cubic yards of shells and as Leathers had only two trucks available, one belonging to himself and another to his brother, R.L. Leathers, he entered into a verbal agreement over long distance telephone with Jake Edwards who has some twelve trucks, to assist him in hauling the shells. Under that agreement he was to pay Edwards 20¢ per cubic yard for the shells he hauled and as each truck's capacity was four cubic yards, the price amounted to 80¢ per truck load. Edwards employed his own drivers who were carried on Leathers' pay roll and paid by him but the amount was deducted in the settlements made between them. Leathers also provided all necessary gasoline and oil for all the trucks used on the job but what amount was used by Edwards' trucks was also charged to him in the settlements made. *Page 491 
From the pay rolls it would appear that Edwards never had more than seven or eight of his trucks running on the job at one time with the two others which belonged to Leathers and his brother.
The Richland dirt road over which the shells were hauled was used by Edwards' trucks the same as by the others but it was graded and kept in good condition by Leathers exclusively and at a considerable expense on his part, for the reason, as stated by himself, that "it was up to (him) to get the material over to the job and (he) had to do that work in order to get the material there." In this connection it may be pertinent to mention that moreover, he built a plank road up the levee and to the hopper which was necessary also. He had a man at the hopper to superintend the loading of the trucks and Edwards' drivers followed the same directions and instructions as the drivers of the other trucks. Even before the accident with which we are concerned in this case happened, the drivers of all trucks had been given instructions, coming from him, to come to a full stop at the highway crossing and railroad crossing, going in both directions, and after the accident he attended to the duty of flagging all the trucks at those crossings himself or had one of his men to do so.
It is shown that all of Edwards' truck drivers were included in Leathers' pay rolls for the purpose of computing the premium to be paid for compensation insurance carried by him and that a check covering Roshto's compensation arising out of this very accident was issued by the insurance company and delivered to Leathers. He couldn't find out at the time where Roshto was living so he turned it over to Edwards to give to him.
Under the facts as above set out we agree with the district judge that the relation of independent contractor did not exist between Leathers and Edwards and that the defendants cannot be relieved of liability in this case on that ground.
In the first place we cannot agree with counsel for defendants that Edwards was employed to perform any specific job, as a unit, for which Leathers could look to him for results only, which we take is an important feature of that relation. Counsel would infer that under the agreement Edwards' employment was to haul the entire four thousand cubic yards of shells, comprising a unit of work as it were, but that is not what the record shows. When Leathers called him over telephone he told him that he had some four or five thousand yards of shells to haul and he agreed then on a price, but certainly as it developed, Edwards did not haul the entire quantity as Leathers had two trucks on the job himself and each hauled the same quantity of shells as any one of Edwards' trucks. Judging by the trouble and expense Leathers took and incurred in order to maintain the road over which the trucks ran, he undoubtedly felt, as he admits, that it was necessary for him to do this in order to get the shells to the job and his whole purpose must have been to get them there as soon as he could because of the time limit in his contract and that is the reason, we believe why he engaged Edwards' trucks to help him out. There is nothing in the record however on which to base the conclusion that he contracted the job of hauling all the shells to Edwards. Counsel for defendants stated that under the agreement between them Leathers could not have discharged Edwards but again we can find nothing on which to arrive at such conclusion and are of the opinion that, to the contrary, each could have terminated the agreement by his own will at any time.
In American Jurisprudence, Vol. 27 p. 486, Section 6, it is stated that "the most important test in determining whether a person employed to do certain work is an independent contractor or mere servant is the control over the work which is reserved by the employer." An application of this test leads to a second reason why we think the relation did not exist in this case. The facts as shown to exist indicate a rather large degree of control and supervision by Leathers over the manner in which the work of hauling these shells was to be performed. The trucks had to be loaded and the shells dumped under the direction of his men and the drivers were given certain instructions coming from him about their manner of driving over the road crossings. What gasoline and oil was required was ordered and distributed by him at an added responsibility and trouble on his part. The drivers were carried on his pay rolls with the view no doubt of seeing that their time was properly kept. Whilst he did not give them formal instructions to follow the route which they did in hauling the shells, and counsel maintain that Edwards could have routed them *Page 492 
over any road he pleased, no matter how long, the fact is that Leathers, at considerable expense to himself kept up a public road for the purpose of hauling the shells and that leaves us with the impression that that is the road he intended they had to use.
In Coon v. Monroe Scrap Material Co., La.App., 191 So. 607, 610, the Court stated: "It is fundamental to the existence of this relationship [that of independent contractor] that there must be absolute independence of action on the part of the contractor in the execution of the work assumed by him. If the contractee has the power to interfere with or control the manner of execution or performance, then the contractor ceases to be independent. His status degenerates into that of an employee or servant." The case of Gallaher v. Ricketts, La.App., 187 So. 351, is cited as authority. In American Jurisprudence, supra, it is stated that, "it is not, however, the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." We think that enough has been shown in this case to conclude that such right or authority did exist on the part of the contractee, J.C. Leathers.
Finally, whilst it does not constitute proof of itself to that effect, we believe that Leathers' action in carrying Edwards' truck drivers on compensation insurance and actually obtaining for Roshto, and having delivered to him, a check for compensation coming to him from the very accident now being investigated, is nevertheless a strong indication of his own idea that Roshto was not the employee of an independent contractor and furnishes a further cogent and persuasive reason for the conclusion we have reached in holding that such relation did not exist between himself and Edwards.
The defendant, Travelers Insurance Company, seeks to evade liability on the further ground that the policy of insurance issued by it and relied on by the plaintiff does not apply to the accident in this case which took place on the Richland road, which it is contended is not part of the contracting premises of the insured contractor, J.C. Leathers.
In setting out the provisions relating to the indemnity carried, the contract of insurance states:
"I. * * * This indemnity subject to the exclusions hereinafter expressed, shall apply only:
"(1) Insofar as such injuries shall result from the business operations of the Assured disclosed in the Declaration, which operations for the purpose of this insurance shall include operations incident or appurtenant thereto, including ordinary repairs and maintenance of Assured's buildings and equipment;
"(2) (as amended April 2, 1938) A. Insofar as such injuries occur (A) at locations which assured is then occupying for the sole purpose of conducting thereon such operations as are disclosed in the declarations (herein called contracting premises) and shall result therefrom.
"B. Insofar as such injuries occur (A) elsewhere than at the central or contracting premises, if caused by (1) employees of assured engaged in such operations who are required in the discharge of their duties to leave such premises (2) or by self-propelled contractors' equipment and appliances (with or without towed equipment) while being moved under their own power between such premises. * * *)"
Counsel for defendants seem to concede that there might be liability on the part of the insurance company were it not for the fact that the accident came under one of the exclusions thereafter referred to. The provision invoked as the exclusion is in the form of an amendment to the policy and reads as follows:
"This agreement shall exclude any obligation of the company for such injuries if caused by * * *
"2. (B) Insofar as such injuries occurred (A) elsewhere than at the central or contracting premises if caused by * * *
"3. (3) (A) any employee of the assured while driving, using, loading, or unloading any vehicle elsewhere than at such locations, except while moving certain equipment as stated above. * * *"
The issue raised involves a construction of the term "central or contracting premises." The interpretation sought by counsel for defendants would lead to a restriction of the actual situs or location of the project itself, which we do not think was intended by the parties to the contract. As shown by its terms the policy is primarily one meant to insure the assured against public liability as a general contractor engaged in road construction work with *Page 493 
specified locations of his operations such as yards and other work places designated by towns or cities as "Des Allemands, Lafourche Parish, and elsewhere within the State of Louisiana." The premium charged is based on the pay roll of the assured, "to include drivers and chauffeurs' helpers." As has been shown, the insured contractor herein had to maintain a hopper at the Mississippi River in order to unload the shells used by him on the project from barges, he had to build a plank road to reach the hopper, he had to grade and keep in order the road leading to the site of the project, and on which the accident happened, in order to carry on his work. This route, so necessary to him, can well be said to have been part of his work place and included within the "central and contracting premises" and as the accident was caused by one of his drivers on those premises, we conclude, as did the district judge, that there was coverage under the terms of the policy.
The most that can be said on the insurance company's side of this issue is that the policy is rather confusing and misleading and, as is well known, it is a cardinal rule of construction of contracts of insurance that all doubts as to their meaning must be resolved against the insurer and where their terms are susceptible to two interpretations, the one as reasonable as the other, that construction the most favorable to the insured must be adopted. Corporation of Roman Catholic Church v. Royal Insurance Co., Ltd., 158 La. 601, 104 So. 383.
With regard to the quantum of damages we find that the amount as awarded for medical and hospital expenses is well supported by the proof. It is also proven that the automobile was damaged to the extent as shown in the award made against the defendant, Leathers, for the benefit of the insurance company which had to pay the loss. With reference to the award for injuries sustained by the plaintiff, J.C. Olano, Sr., and those of his minor son, J.C. Olano, Jr., the testimony is to the effect that they both suffered considerable shock, bruises and cuts but neither sustained any permanent injury or resulting disabilities except for some slight disfiguring scars. There is some evidence to the effect that the young boy developed an abscessed tooth which necessitated its replacement by a bridge and that is probably caused by the injury to his mouth. Mr. Olano did not lose more than ten days from his work and the young boy did not remain out of school more than a month. We think that the award made in each case is fair and reasonable and we are not inclined to disturb them, one way or the other. Mr. Olano asks for an increase in the amount of the award made for nursing in the sum of $6 which he had to pay to a Miss Rose Freeman but there is no proof to support this charge. He also claims that he should be allowed the sum of $125 more for the estimated costs of replacing a tooth in the mouth of his son but we do not find the evidence satisfactory to the point where we can hold that the dental work required is a result of this accident. The attending dentist states only that it may have been caused by it. The trial judge refused to allow this amount and we cannot say that he erred in doing so.
For the reasons stated it is ordered that the judgment appealed from be affirmed at the costs of the defendants, appellants herein.